UNITED STATES of America

v.

Milan YURASOVICH, Appellant.

No. 78–1066.

United States Court of Appeals,
Third Circuit.

Argued June 6, 1978.

Decided July 26, 1978.

Robert McClenahan, Janavitz, Janavitz & Kanfoush, Pittsburgh, Pa., for appellant.

Blair A. Griffith, U. S. Atty., Joel B. Strauss, Bruce A. Antkowiak, Faye M. Gardner, Asst. U. S. Attys., Pittsburgh, Pa., for appellees.

Before ADAMS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Milan Yurasovich, the appellant in this case, pleaded guilty to two counts of a four count federal indictment for mail offenses, but after his sentencing he refused to testify at a trial of his co-defendant on the ground that his testimony could lead to additional criminal liability. The trial judge ruled that Yurasovich's guilty plea had dissipated his Fifth Amendment privilege, and held Yurasovich in contempt. The issue before us is whether this contempt conviction can stand.

### A. FACTS

From the record, it appears that Yurasovich was involved with Harold Sonnenberg, and perhaps with an individual named Jenkins, in a scheme to use stolen and forged mailbox keys to rifle mailboxes and to dispose of their contents. Some time before

the events at issue here, Yurasovich and Sonnenberg were indicted in state court on two counts: for burglary and for receiving stolen property. Yurasovich pleaded guilty to the receiving stolen property count, but after a trial, Sonnenberg was acquitted of both charges. The record does not reveal the fate of the burglary charge that was lodged against Yurasovich.

In April 1977, Yurasovich and Sonnenberg were indicted once again, this time on four federal charges arising from the use of the mailbox keys: (1) unauthorized possession of mailbox keys with the intent to use such keys improperly; (2) possession of forged mailbox keys with the intent to use such keys improperly; (3) possession of stolen letters; and (4) stealing mail with the intent to obstruct correspondence. The federal indictment contained no conspiracy count.

On December 5, 1977, after Yurasovich had pleaded guilty to two counts of the federal indictment, and the day before Sonnenberg's trial, the United States Attorney in Pittsburgh, subpoenaed Yurasovich. A somewhat lengthy recapitulation of the developments concerning that subpoena is necessary to place this case in proper factual context.

At approximately the same time that the Pittsburgh subpoena was presented, Yurasovich was served by Postal Inspector Egan with a subpoena to appear before a federal grand jury in Chicago, which was investigating mail theft schemes there that were similar to those that had been executed in Pittsburgh. The next day, at a discussion in the chambers of the trial judge, Hon. Maurice Cohill of the Western District of Pennsylvania, Yurasovich indicated that, in view of the Chicago investigation and the possibility of future state and federal conspiracy charges in Pittsburgh, and on the

advice of counsel, he wished to invoke the Fifth Amendment.

A colloquy then ensued among Judge Cohill, Yurasovich and the United States Attorney. The United States Attorney stated that in examining Yurasovich he would attempt to "develop . . . facts which go to an integral criminal scheme" to steal mail.[1] Apparently the goal of the United States Attorney was to establish that Sonnenberg had an "unlawful purpose" in possessing the mailbox keys at issue. Judge Cohill, in reply, explained that he intended to order Yurasovich to answer questions "with respect to the charges that were contained in that indictment that you plead (sic) guilty to, the two counts and in addition the two counts that were dismissed."[2] Yurasovich rejoined that his counsel had advised him not to testify. The trial judge concluded the proceedings by admonishing Yurasovich to consult his attorney again.

The next day, the discussion in chambers resumed, this time with Mr. McClenahan, Yurasovich's lawyer, present. The district judge expressed the view that testimony "as to the incidents which he plead guilty here and [those] I dismissed" would not be incriminating since future prosecutions would be barred by the double jeopardy clause.[3] In reply, Yurasovich's counsel asserted that answers to questions concerning the activities to which he pleaded guilty "could lead to information from which [Yurasovich] could be indicted for other charges in Chicago, in Pittsburgh, anywhere,"[4] and noted apprehension about the possible scope of cross-examination.

After a recess, the trial judge advised Yurasovich that he would be permitted to invoke the Fifth Amendment, "with respect to any questions [by the prosecutor] you haven't been convicted on," and to decline

---

1. N.T. 16a.

2. 11a, see 12a (Yurasovich informed that he would be directed to answer questions "within the scope of charges in this case"); 13a (Yurasovich would be required to respond to "any questions . . . that are involved with the charges that he has either pleaded to or are

dismissed"); 17a–18a (trial judge stated that answers would be compelled to "questions that are related to the charges that you plead (sic) guilty to here or that were dismissed here").

3. 18a.

4. 21a.

to answer questions by defense counsel "about something that is not related to this trial." [5] Nonetheless, stated the trial judge, Yurasovich would be required to answer "any questions" the prosecutor propounded "with respect to" the four offenses contained in the indictment.[6]

Yurasovich again expressed his concern about the potential effects of his responses on possible indictments in Chicago,[7] and stated that he had been advised by his attorney that his answers could be used to "squeeze" him in Illinois.[8]

At that point, Judge Cohill, addressing Yurasovich, ordered:

I am directing you right now to answer *any questions* in front of the jury that Mr. Strauss asks you with respect to the two offenses, the two counts you plead guilty to, or the two counts which were dismissed against you.

Now are you telling me that you intend not to obey *that order*?

Yurasovich: Yes sir, I'm going to exercise my right to the Fifth Amendment. (emphasis added) [9]

The trial judge thereupon declared that Yurasovich had placed himself in contempt, and Yurasovich was not required to take the witness stand. Despite the absence of Yurasovich's testimony, Sonnenberg was adjudged guilty of all four mail offenses. After a subsequent hearing, Yurasovich was convicted of criminal contempt by Judge Cohill, and sentenced to six months' imprisonment for this separate offense. Yurasovich now appeals his conviction for contempt.

Two questions are thus presented to us: First, was the trial court's order invalid under the Fifth Amendment? Second, if so,

was Yurasovich's refusal to testify specific enough to allow him to take advantage of the order's invalidity?

## B. THE ORDER AND FIFTH AMENDMENT PRIVILEGE

### 1. *Existence of Privilege*

█ The privilege against self-incrimination embodies the decision of our society to opt for an adversarial rather than an inquisitorial system of justice. The principle adopted is that "it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with assistance of enforced disclosures by the accused." [10] As Justice Powell remarked in *Kastigar v. United States*, the principle against self-incrimination "reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty. . . . This Court has been zealous to safeguard the values that underlie the privilege".[11]

At issue here is an order that directly implicates the core of the Fifth Amendment. For if Yurasovich's contentions are correct, his contempt conviction is punishment for refusal to give testimony which could be used against him in an on-going investigation of criminal activities in Chicago.

█ A quarter century ago, in *Hoffman v. United States*,[12] the Supreme Court declared that the privilege "not only extends to answers that would in themselves support a conviction under a federal criminal statute, but likewise embraces answers which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." [13] To support a con-

---

5. 30a–31a.

6. *Id.*

7. 29a.

8. 31a.

9. 32a.

10. *Ullmann v. United States*, 350 U.S. 422, 427, 76 S.Ct. 497, 501, 100 L.Ed. 511 (1965) *quoting*

*Maffie v. United States*, 209 F.2d 225, 227 (1st Cir. 1954) (Magruder, Ch. J.).

11. 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972).

12. 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

13. *Id.* at 486, 71 S.Ct. at 818.

tempt citation for a refusal to testify on Fifth Amendment grounds, the Court declared, it must be *"perfectly clear* from a careful consideration of all the circumstances in the case, that the witness [who invokes the privilege] is mistaken, and that the answer[s] cannot *possibly* have such a tendency to incriminate." [14] In the intervening years, the Court has consistently adhered to the precepts laid down in *Hoffman*.[15]

■ Judged by such standards, the line of questioning to which Yurasovich was ordered to respond trenched upon areas protected by the Fifth Amendment.

■ Initially, we note that the trial court apparently engaged in an inaccurate analysis of the problem before it. In the hearing on Yurasovich's contempt citation, the trial judge stated:

> With respect to the Fifth Amendment promise of immunity, certainly any statement made here that would be attempted to be used against him in Chicago would be subject to suppression because of the Court here making an order compelling the defendant to testify. We hold as a matter of law that Mr. Yurasovich was in criminal contempt of this Court. . . .[16]

The argument that subsequent suppression is an adequate protection of the Fifth Amendment rights of a witness compelled to testify was explicitly rejected by a unanimous Supreme Court in *Maness v. Meyers*,[17] Chief Justice Burger there stated:

> In the present case the City Attorney argued that if petitioner's client produced the magazines, he was amply protected because in any ensuing criminal action he

could always move to suppress . . . . . Laying to one side possible waiver problems that might arise if the witness followed that course, cf. *Rogers v. United States*, 340 U.S. 367 [71 S.Ct. 438, 95 L.Ed. 344] (1951), we nevertheless cannot conclude that it would afford adequate protection. Without something more "he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman v. United States, supra* at 486, 71 S.Ct. at 818.

Whatever deference is due a trial judge in normal circumstances is thus severely undercut by the fact that the trial court's evaluation of Yurasovich's Fifth Amendment claim was based on reasoning at variance with that expounded by the Supreme Court.

The trial court's final order directed Yurasovich to "answer any questions . . . that [the prosecutor asks] with respect to" the four counts on which Yurasovich was originally charged in the federal court.

Presumably those inquiries could include Yurasovich's prior dealings with both Sonnenberg and the elusive Jenkins. If Yurasovich had planned the plunder of mailboxes in concert with Sonnenberg or Jenkins, such questions could unearth information leading to conspiracy prosecutions in state and federal courts. And since no allegations of conspiracy were contained in the prior state or federal indictments, such charges would not be barred by a double jeopardy defense.[18] More broadly, it is not difficult to discern the possibility that the details of the transactions between Sonnenberg and Yurasovich could provide clues to criminal liability in Chicago. Indeed, the

---

**14.** *Id.* at 488, 71 S.Ct. at 819 (emphasis in the original).

**15.** *E. g. Malloy v. Hogan,* 378 U.S. 1, 12, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Maness v. Meyers,* 419 U.S. 449, 461, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975).

**16.** 53a.

**17.** 419 U.S. 449, 461–62, 95 S.Ct. 584, 593, 42 L.Ed.2d 574 (1975).

**18.** *Cf.* 29a–30a (Yurasovich expressed his apprehension to Judge Cohill: ". . . just from this transcript with the subpoena, it could lead to an indictment. It could show a conspiracy to anything that I give testimony here.")

Likewise, depending on the ultimate disposition of the state court burglary charge against Yurasovich, answers regarding the "obstruction of mails/theft" count which was dismissed could be used in a future state burglary prosecution.

Chicago grand jury apparently suspected some connection between Yurasovich's activities in Pittsburgh and the wrongdoing in Chicago. Such "links," although perhaps not directly incriminating, fall within the protection of the Fifth Amendment as defined in *Hoffman.*

The inculpatory potential in this case is not imaginary. It is conceded that Yurasovich had been subpoenaed by the Chicago grand jury to testify with respect to some violation of the postal laws in that city.[19] Postal Inspector Egan, who delivered that subpoena, also participated in the attempt by the United States Attorney to induce Yurasovich to testify. And Yurasovich testified that Egan threatened to use the Chicago grand jury to "put him away."[20]

Thus, the testimony which the government sought to compel regarding the circumstances surrounding the joint activities of Yurasovich and Sonnenberg set forth in the indictment pending against Sonnenberg might well have tended to incriminate Yurasovich. The trial judge could hardly have found it to be "perfectly clear" that answers to "any questions Mr. Strauss [the United States Attorney] asks with respect to" the offenses set forth in the federal indictment "could not possibly" tend to incriminate Yurasovich.

We find this case indistinguishable in any relevant respect from the situation presented in *Malloy v. Hogan.*[21] The defendant in *Malloy* was arrested during a gambling raid, and pleaded guilty to "pool selling," a misdemeanor under state law. Two years later, after the statute of limitations for misdemeanors had run, Malloy refused to answer questions before a state grand jury investigating gambling. Those inquiries concerned, *inter alia,* the name of the per-

son who employed him in his original pool-selling activity; the owner of the apartment in which the pool-selling for which he was convicted took place; and whether he knew "John Bergoti." Such queries would have come within the ambit of Judge Cohill's admonition regarding "questions with respect to" a prior guilty plea.

The Supreme Court reversed Malloy's contempt citation, holding that his refusal to answer was protected by the Fifth Amendment. Despite the fact that he could not have been prosecuted again for pool-selling, both on double jeopardy and statute of limitations grounds, and that there was no evidence that Malloy had engaged in any other crime, the Supreme Court said:

> It was apparent that the petitioner might apprehend that if [his former employers] were still engaged in unlawful activity, disclosure of his name might furnish a link in a chain of evidence sufficient to connect the petitioner with a more recent crime for which he might still be prosecuted.[22]

A similar analysis applies here. Thus, unless the privilege has been "waived," Yurasovich's refusal to comply with an order to answer "any" questions was protected from sanctions by the Fifth Amendment.

### 2. *Waiver of Privilege*

■ The government suggests that even if Yurasovich's refusal arguably might be privileged absent other circumstances, his guilty plea served to waive any Fifth Amendment rights with regard to details of the offenses which he admitted. In support of this proposition, the government cites dicta from a number of cases to the effect that a "plea of guilty to [a given] charge

---

19. 64a.

20. 67a.

21. 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

22. *Id.* at 13, 84 S.Ct. at 1496. *See United States v. Garcia,* 544 F.2d 681, 684–85 (3d Cir. 1976). In *Garcia* the trial judge conditioned

leniency in sentencing on the defendant's agreement to reveal details of the overt acts of the conspiracy to which he pleaded guilty. This court held that where such details could subject the defendants to subsequent indictments, the trial judge's action violated the Fifth Amendment privilege.

would erase any testimonial privileges as to that conduct."[23]

■ We observe that Yurasovich pleaded guilty only with respect to two counts—unauthorized possession of mailbox keys and possession of stolen letters—but the order at issue directed him to testify in addition with respect to charges of possessing forged keys and stealing mail, which had been dismissed. We are not convinced that pleading guilty to counts involving one set of offenses by its own force can waive a privilege with respect to other alleged transgressions for which charges are dropped, and which were not admitted.

■ In any event, the better-reasoned authorities construe the language cited by the government to infer a waiver of Fifth Amendment rights solely with respect to the crime to which the guilty plea pertains. If such crime is the only one for which the defendant is potentially liable, he can be forced to testify. But if the witness is still subject to prosecution for other crimes which his testimony might tend to reveal, the privilege remains.[24] Under this latter position, Yurasovich would retain his Fifth Amendment right, since as noted above he may potentially be liable for a number of crimes in addition to those to which he pleaded guilty.

The precise outlines of the "waiver" doctrine are not clarified by the case law, and the theoretical underpinnings for the rule remain shrouded in some uncertainty. Nonetheless, the rationales which have been advanced for the rule of guilty-plea waiver support the view that Yurasovich cannot be held to have waived his Fifth Amendment rights by a guilty plea.

Insofar as a guilty plea terminates proceedings which embody *all* of the potential criminal charges to which a witness is exposed, the double jeopardy clause shields the witness from further prosecution. Since no further inculpatory potential in a witness' testimony can serve as a basis for invocation of the Fifth Amendment, the guilty plea can be said to have "waived" the privilege against self-incrimination. In Yurasovich's case, however, the double jeopardy clause would not preclude future indictments.

To the extent that the "waiver" arising from admission of a crime reaches beyond the immunity conferred by the double jeopardy clause, such effect has been said to rest on two grounds. First, it has been argued, if the answer to the question propounded could provoke no criminal liability beyond that which can be supported by answers previously given, the protection

**23.** *Namet v. United States,* 373 U.S. 179, 188, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963) *see, e. g. Reina v. United States,* 364 U.S. 507, 513, 81 S.Ct. 260, 5 L.Ed.2d 249 (1961) ("Ordinary rule is that once a person is convicted of a crime he no longer has privilege against self-incrimination, *as he can no longer be incriminated by his testimony about said crime*" *emphasis supplied*); *In re Liddy,* 165 U.S.App.D.C. 254, 260, 506 F.2d 1293, 1299 (*en banc* 1974) *quoting United States v. Romero,* 249 F.2d 371 (2d Cir. 1957) ("It is well established that once a witness has been convicted for the transactions in question he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify.")

The statements cited by the government in *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) and *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), made in connection with Rule 11, that a guilty plea waives Fifth Amendment rights refer clearly to the right against self-incrimination with respect to the crime to which the guilty plea is entered, rather than a waiver of rights with regard to testimony in a future proceeding.

**24.** *E. g. United States v. Pierce,* 561 F.2d 735, 738 (9th Cir. 1977); *United States v. Wilcox,* 450 F.2d 1131, 1142, n.12 (5th Cir. 1971); *United States v. Johnson,* 488 F.2d 1206 (1st Cir. 1973); *United States v. Seavers,* 472 F.2d 607 · (6th Cir. 1973).

We note also that *Reina* stated the basis for the rule to be the fact that "[the defendant] can no longer be incriminated", 364 U.S. at 513, 81 S.Ct. at 264, and that in *Namet* the trial court, which was upheld on appeal, ruled that the guilty plea at issue did not render all of the witnesses' conduct immune from further prosecution, and therefore sustained the privilege with respect to a portion of the testimony. 373 U.S. at 188, 83 S.Ct. 1151. *See also, United States v. Frumento,* 552 F.2d 534, 541 n.10 (3d Cir. 1977) (en banc) (reading *Liddy* as premised on fact that witness had been granted immunity).

against incrimination provided by the privilege serves no purpose. Second, some courts have been wary of allowing witnesses to "edit" their testimony by revealing only exculpatory matters while withholding inculpatory details of those same circumstances under the shield of the Fifth Amendment. Neither reason is applicable to the present case.

*Brown v. Walker* [25] was apparently the progenitor of the "waiver" doctrine. There the Supreme Court engaged in a survey of the boundaries of the Fifth Amendment right, and concluded that "When examined the cases [creating exceptions to the privilege] will all be found to be based upon the idea that, if the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness, the rule ceases to apply." [26] As an instance, the Court cited the principle that "if the witness elects to waive his privilege . . . and discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure." [27] In its more modern form, the waiver doctrine was crystallized in *United States v. Rogers* [28] where the Court held that the admission that a witness was Secretary of the Communist Party precluded her invocation of the Fifth Amendment to prevent a grand jury from forcing her to disclose the location of Party membership lists. Again, the Court held that the question before it was whether the answer to the additional question "presented a reasonable danger of further crimination in light of all the circumstances," including past disclosures. [29] Thus where a crime is admitted, courts have suggested that its details may not be privileged, to the extent that such details do not reveal or substantiate a new crime.

Here, the crimes admitted by Yurasovich were those charged in counts one and three of the federal indictment: unauthorized possession of mailbox keys and possession of stolen mail, on February 16, 1977, in Harmar Township. Since Yurasovich's testimony could well provide information beyond that contained in the federal indictment which could serve as a link in the chain of evidence connecting him with other crimes (including conspiracy), it would appear that under *Rogers* and *Brown* no "waiver" of his right to refuse to expand on the indictment had taken place.

The second analysis in support of the waiver doctrine is grounded in policies which are asserted to offset the Fifth Amendment privilege. Some opinions have expressed a disinclination to allow witnesses to utilize the Fifth Amendment to expurgate their testimony once it is freely begun. This attitude draws support from general faith in cross-examination as a means of attaining truth, [30] and finds roots in the maxim that the Fifth Amendment does not protect perjury, in view of the fact that effective distortion is possible by means of selective disclosure of the truth. [31]

This second concern however is also inapplicable here. Yurasovich did not attempt to testify selectively or to mislead an investigation. Rather, he refused in a subsequent proceeding to go beyond the admissions that he had made in pleading guilty, on the ground that further admissions would endanger him as to other charges to which he had not pleaded.

■ In this regard, Yurasovich is protected by the principle of *In re Neff.* [32] The defendant in *Neff* answered certain questions before a grand jury regarding her affiliation with the Communist Party. At

---

**25.** 161 U.S. 591, 597, 16 S.Ct. 644, 40 L.Ed. 819 (1896).

**26.** *Id.* at 597, 16 S.Ct. at 647.

**27.** *Id.*

**28.** 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951).

**29.** *Id.* at 374, 71 S.Ct. at 442. *See id.* 372–73, 71 S.Ct. 438.

**30.** *See Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958).

**31.** *See Rogers v. United States*, 340 U.S. 367, 371, 71 S.Ct. 438, 95 L.Ed.2d 344 (1951).

**32.** 206 F.2d 149, 152 (3d Cir. 1953).

the trial of another person on charges handed down by the same grand jury, however, Ms. Neff refused, on Fifth Amendment grounds, to answer questions identical with those she replied to earlier. A panel of this Court held her refusal to be privileged, stating: "It is well settled by the overwhelming weight of authority that a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it [the privilege] as to the same matter in a subsequent trial or proceeding." [33]

Thus, under *Neff* it cannot be claimed that Yurasovich's guilty plea "waived" his Fifth Amendment right with respect to testimony sought to be adduced in a later proceeding.[34]

## C. YURASOVICH'S INVOCATION OF THE PRIVILEGE

Finally, the government urges that, even if the order to testify was overbroad, Yurasovich's assertion of his privilege likewise extended too far, and he was therefore in violation of the valid "portion" of the trial judge's order. Yurasovich's "blanket" refusal, the government claims, is grounds for a contempt conviction.[35]

The first difficulty with such a position arises from the precise words of the dialogue which occurred between Yurasovich and the trial judge. The trial court's order

was to testify regarding "any" questions the United States Attorney might ask. In contrast to the normal grand jury situation, where the witness refuses to answer a series of discrete questions, the order here was undivided, and in essence indivisible. The best response that could have been crafted to such an order, even by an attorney, would have been "I will answer those questions which do not tend to incriminate me, or to waive my privilege, and refuse to answer the remainder." In fact, Yurasovich's reaction was, "I'm going to exercise my right to the Fifth Amendment."

■ Yurasovich's statement could be interpreted as a "blanket refusal;" it could also be interpreted as a layman's attempt to invoke the Fifth Amendment with respect to an overbroad and undefined order to testify. It is settled law that:

> [A] claim of privilege does not require any special combination of words. Plainly a witness need not have the skill of a lawyer to invoke the protection of the Self Incrimination Clause. . . .
>
> [T]he fact that a witness expresses his intention in vague terms is immaterial so long as the claim is sufficiently definite to apprise the [questioner] of his intention. As everyone agrees, no ritualistic formula is necessary to invoke the privilege.[36]

**33.** *See Emspak v. United States*, 349 U.S. 190, 201 n.24, 75 S.Ct. 687, 99 L.Ed. 997 (1955) (citing *Neff* approvingly); *United States v. Housand*, 550 F.2d 818, 821 n.3 (2d Cir.) *cert. denied* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977) (following *Neff*); *United States v. Cain*, 544 F.2d 1113 (1st Cir. 1976) (*Neff* is hornbook law); *United States v. Johnson*, 488 F.2d 1206, 1210 (1st Cir. 1973) (following *Neff*); *Ottomano v. United States*, 468 F.2d 269 (1st Cir. 1972) *cert. denied* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973) (following *Neff* in case of refusal to testify in trial of co-defendant where witness had already been tried and convicted on same indictment). *But see Ellis v. United States*, 135 U.S.App.D.C. 35, 49, 416 F.2d 791, 805 (1971) (rejecting *Neff* as "formalistic").

**34.** *See also United States v. Garcia, supra* note 22, where the Court gave no intimation that a guilty plea would waive Fifth Amendment

rights regarding details of a crime admitted, where such details could provoke further indictments.

**35.** *See e. g. United States v. Pierce*, 561 F.2d 735 (9th Cir. 1977); *United States v. Malnik*, 489 F.2d 682 (5th Cir.) *cert. denied* 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974).

**36.** *Quinn v. United States*, 349 U.S. 155, 161–64, 75 S.Ct. 668, 99 L.Ed. 964 (1955); *see Emspak v. United States*, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997 (1955).

While *Quinn* and *Emspak* arose in the context of a contempt of Congress prosecution, it is also settled that the power of Congress to compel testimony and that of the courts spring from the same sources. *See United States v. Bryan*, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1949).

It would seem, therefore, that when the issue of criminal liability turns on the construction of words invoking the Fifth Amendment we should not resolve doubts against the witness.

More importantly, from the language of the Supreme Court's decisions in *Maness, Malloy* and *Hoffman*, we draw the conclusion that once a prima facie claim of privilege is raised, it is the burden of the government to make it "perfectly clear" that the answers sought "cannot possibly" tend to incriminate. For, "if the witness upon interposing his claim were required to prove the hazard, . . . he would be compelled to surrender the very protection which the privilege is designed to guarantee." [37] The burden of resolving ambiguity thus falls upon the government. The United States Attorney on no occasion set forth the questions he intended to ask so as to allow Yurasovich accurately to calculate the limits of his potential liability, or to force him to particularize the scope of his invocation of the privilege.[38] Nor did the prosecution offer Yurasovich immunity, a step which would have obviated his Fifth Amendment objections.

We thus cannot hold it to be "perfectly clear" that Yurasovich transgressed the contours of his constitutional privilege. Indeed, given the somewhat indistinct boundaries of the "waiver" doctrine, the statement that Yurasovich did not intend to answer "any" questions propounded by the prosecution regarding the events at issue would seem to have been no more than a prudent assertion of Yurasovich's rights.

## CONCLUSION

The order that forms the basis for Yurasovich's contempt citation invaded his Fifth Amendment rights and was therefore invalid. Since he neither waived his Fifth Amendment rights as a result of a guilty plea in a prior proceeding nor improperly invoked those rights, Yurasovich's conviction will be reversed.

---

**37.** *Malloy v. Hogan*, 378 U.S. 1, 12, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) *quoting United States v. Hoffman*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). *See Maness v. Meyers*, 419 U.S. 449, 462, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). *Cf. Lefkowitz v. Cunningham*, 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed. 21 (1977) and *Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1975) *both quoting Lefkowitz v. Turley*, 414 U.S. 70, 78, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973) ("[A]

witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant.")

**38.** The prosecutor volunteered the information that "I will confine my questions to within the scope of the indictment." 24a.