UNITED STATES of America

v.

James WILSON.

Crim. No. 84–333–03.

United States District Court,
E.D. Pennsylvania.

Nov. 8, 1984.

Edward S.G. Dennis, Jr., U.S. Atty., Karl K. Lunkenheimer, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

Andrew G. Gay, Gay & Chacker, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

A jury has found the defendant, James Wilson, guilty on Counts One and Two of Indictment No. 83–333–03, charging him with conspiracy to distribute methamphetamine, in violation of Title 21 U.S.C. § 846, and of aiding and abetting the distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2(a). The jury also found Wilson's co-defendant, Victor Bermes, guilty of the same offenses. Prior to trial George Mullen, the third defendant named in the Indictment, entered a plea of guilty to Counts One, Two, and Three, which charged him with conspiracy to distribute methamphetamine, distributing methamphetamine, and using a communications facility to facilitate the distribution of methamphetamine in violation of 21 U.S.C. § 843(b).

Defendant Wilson has moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or, alternatively, for a new trial pursuant to Rule 33 on the ground that the evidence produced at trial was insufficient to support a guilty verdict. Wilson also contends (1) that the Court denied him his right to confrontation under the Sixth Amendment to the Constitution by admitting into evidence hearsay statements of George Mullen, and (2) that a reference by the prosecutor to "Angelo Bruno" in his rebuttal sum-

mation was unduly prejudicial and deprived Wilson of a fair trial. For the reasons that follow, Wilson's motion for a judgment of acquittal, or in the alternative for a new trial, will be denied.

■■■ On a motion for judgment of acquittal, the Court is "required to view the evidence in the light most favorable to the prosecution and to draw all reasonable inferences therefrom in the prosecution's favor." *United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir.1984), citing *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Viewing the evidence in this light, the trial court is obliged to uphold the verdict unless no rational jury could conclude beyond a reasonable doubt that the government has proved all the elements of the offense charged. *Id.; see also Burks v. United States*, 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–2150, 57 L.Ed.2d 1 (1978); *United States v. Doan*, 710 F.2d 124, 126–27 (3d Cir.1983). On the other hand, a motion for a new trial on the ground that the verdict is against the weight of the evidence is directed to the sound discretion of the trial court, which may weigh the evidence but may set aside a verdict and grant a new trial only if it determines that the verdict constitutes a miscarriage of justice. *United States v. Phifer*, 400 F.Supp. 719, 723 (E.D.Pa.1975), *aff'd* 532 F.2d 748 (3d Cir. 1976). The Court must also grant a new trial if there is a reasonable probability that trial error could have had a substantial influence on the jury's decision. *See Government of Virgin Islands v. Bedford*, 671 F.2d 758, 762 (3d Cir.1982); *United States v. Mastro*, 570 F.Supp. 1388, 1390 (E.D.Pa.1983). In the present case, the evidence was amply sufficient to support the jury's verdict under both the Rule 29 standard and the Rule 33 standard, and the defendant's legal arguments are without merit.

*Sufficiency of the Evidence*

■■■ The evidence showed that in July of 1984 Mullen negotiated to sell a large quantity of methamphetamine to two individuals who turned out to be undercover law enforcement officers, Detective John D'Amico of the Philadelphia Police Department and Special Agent Stephen Hopson of the Drug Enforcement Agency. On July 31, 1984 Mullen met with D'Amico and told him that his supplier of methamphetamine was having some problems in connection with the sale to D'Amico. Mullen identified his supplier to D'Amico as his "cousin Jim". In D'Amico's presence Mullen called "Jim" from a pay telephone and discussed the sale of the methamphetamine. D'Amico at that time also spoke on the telephone to Jim, and negotiated some details of the sale. Mullen previously had told D'Amico and Hopson that Jim's partner, named "Vic," was a Sergeant-at-Arms of the Warlocks Motorcycle Club.

On August 1, 1984, Mullen delivered approximately ten pounds of methamphetamine to D'Amico and Hopson. The agreed-upon purchase price was $85,000. Mullen told D'Amico that Mullen had already given Vic $15,000 in advance. Mullen was then arrested and agreed to cooperate with the agents in the arrest of "Jim" and "Vic". That evening D'Amico and Hopson tape-recorded a telephone call between D'Amico, on the one end, and Vic and Jim on the other end. D'Amico complained to Vic and Jim about the methamphetamine which Mullen had delivered. Jim and Vic spoke extensively about the methamphetamine with D'Amico, and eventually, after several phone conversations, Jim and Vic agreed that Mullen should bring them five pounds of the methamphetamine for further processing. After the final conversation D'Amico and Hopson, accompanied by Mullen (and several government agents), went to defendant Wilson's home and arrested Wilson and Bermes.

At trial, defendants Wilson and Bermes both elected not to testify. The tape-recorded conversations between D'Amico, "Vic", and "Jim" were played for the jury. Defendants' counsel did not dispute the fact that a conspiracy to distribute methamphetamine existed, and that Mullen and the two individuals recorded in the phone

conversations with D'Amico were members of the conspiracy. Defendant Wilson contends, however, that the government failed to prove beyond a reasonable doubt that "Jim" and "Vic", the voices on the tapes, were the same individuals as the defendants, James Wilson and Victor Bermes.

Officer D'Amico spoke extensively with "Jim" and "Vic" on the telephone. He also heard defendants Wilson and Bermes speak at the time of and subsequent to their arrest. He also had listened to the taped conversation between himself, "Jim", and "Vic" on several occasions. Agent Hopson heard Wilson and Bermes speak at the time of their arrest and during post-arrest processing. Hopson also had listened to the taped conversations between D'Amico, "Jim", and "Vic" on a number of occasions. Both D'Amico and Hopson positively and unequivocally identified the voices of "Jim" and "Vic" on the tapes as the voices of James Wilson and Victor Bermes. This Court instructed the jury that it is permissible to base identification of voices heard in telephone conversations on relatively few conversations between a government agent and the speaker, and it is not required that such exchanges occur prior to interception; they may occur at or after arrest. *United States v. Vento*, 533 F.2d 838, 865 (3d Cir.1976). The *Vento* court went on to note

> [i]n fact, it is not necessary to present direct evidence to identify the intercepted voice. Circumstantial evidence has often been employed to identify callers on tapped lines. Accordingly, we believe that the questions of weight and sufficiency of the evidence relating to the identification of [the defendant's] voice were matters for the jury.

*Id.* (footnotes omitted).

In addition to the voice identification by the government witnesses, there was other evidence identifying Wilson and Bermes as the same individuals whose voices were on the tapes. Mullen told D'Amico that "Jim" was his cousin, and that "Jim's" partner "Vic" was a member of the Warlocks. Several members of Wilson's family, called by Wilson as character witnesses, acknowledged that Mullen and Wilson were cousins. At the time of his arrest Bermes possessed a card which carried the name "Vic" and identified him as a member of the Warlocks Motorcycle Club. In addition, several persons called as character witnesses on Bermes' behalf identified him as a member of the Warlocks. Thus, the identification evidence against Bermes and Wilson was overwhelming, and the jury rationally could have concluded that the government had established their guilt of the crimes charged in Counts One and Two beyond a reasonable doubt.

*Admission of Co-Conspirator Hearsay Statements*

Wilson also contends that the Court erred in admitting the hearsay statements made by Mullen to D'Amico. Wilson claims that the admission of these statements violated his rights under the Confrontation Clause of the Sixth Amendment.

Before turning to Wilson's Confrontation Clause contention, the Court notes that Mullen's statements to D'Amico clearly were admissible against Wilson pursuant to the co-conspirator "exception" to the hearsay rule set forth in Fed.R.Evid. 801(d)(2)(E). That Rule provides that statements offered against a party that are made "by a co-conspirator of a party during the course and in furtherance of the conspiracy" are not hearsay and are admissible. In order to support the admission of out-of-court statements under Rule 801(d)(2)(E), the government must establish by a fair preponderance of independent evidence (1) that a conspiracy existed and that the declarant and the defendant were connected to it; (2) that the statement was made in furtherance of the conspiracy; and (3) that the statement was made during the course of the conspiracy. *United States v. Ammar*, 714 F.2d 238, 245 (3d Cir.), *cert. denied* —— U.S. ——, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). *See also United States v. Gibbs*, 739 F.2d 838, 842–43 (3d Cir.1984) (en banc); *United States v. Continental Group, Inc.*, 603 F.2d 444, 457 (3d Cir.1979), *cert. denied*, 444 U.S. 1032, 100

S.Ct. 703, 62 L.Ed.2d 668 (1980); *United States v. Trotter*, 529 F.2d 806, 811–13 (3d Cir.1976). When the defendants objected to the admission of Mullen's statements at trial, this Court, based upon the government's offer of proof, admitted the statements subject to the subsequent introduction of the requisite independent evidence. *See United States v. Ammar*, 714 F.2d at 246–47. The taped conversations of Bermes and Wilson, and the officers' corroborating voice identifications, constituted the requisite independent evidence of their participation in the conspiracy, and this Court made a finding on the record outside the jury's presence that the government had established by a preponderance of independent evidence (1) that the conspiracy existed; (2) that Mullen, Bermes, and Wilson were members of that conspiracy; and (3) that Mullen's statements made to the agents prior to his arrest were made during the course of and in furtherance of the conspiracy.

Wilson also contends that the admission of Mullen's hearsay statements violated his Sixth Amendment guarantee that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court held that

the Confrontation Clause restricts the range of admissible hearsay by imposing a two-pronged requirement: first, the government must normally show that the defendant is unavailable and the hearsay statement is thus necessary; and second, the statement must bear sufficient "indicia of reliability" to demonstrate its trustworthiness.

*United States v. Ammar*, 714 F.2d at 255, citing *Ohio v. Roberts*, 448 U.S. at 65–66, 100 S.Ct. at 2538–39. *See United States v. Gibbs*, 739 F.2d at 846 n. 21.

In *United States v. Gibbs*, the trial court admitted hearsay statements of a co-conspirator who had pleaded guilty, was awaiting sentencing, and did not testify at trial. Because the defendant did not properly preserve his Sixth Amendment argument

for appeal the *Gibbs* court did not explicitly decide whether unavailability *must* be demonstrated by the government to satisfy the Confrontation Clause where a co-conspirator hearsay statement is sought to be admitted. 739 F.2d at 847. However, the court stated that if the issue of unavailability had been raised at trial

it would have been a relatively simple matter for the government to address that question and produce proofs as to the [the declarant's] availability or unavailability. Presumably the government could have called [the declarant] and if [the declarant] asserted the Fifth Amendment right against self-incrimination, he then would have been deemed unavailable.

739 F.2d at 848.

■■■ In the present case the government called Mullen to testify. Mullen, in response to questions posed outside the jury's presence regarding his involvement in the methamphetamine transaction and his sources of methamphetamine, invoked his Fifth Amendment privilege against self-incrimination. Although Wilson does not contest the validity of Mullen's Fifth Amendment claim, this Court determined that Mullen did have a valid Fifth Amendment privilege for several reasons. First, as noted above, Mullen was awaiting sentencing before this Court. It is clear that the Fifth Amendment prevents the government from compelling a defendant to testify where his testimony could be used to enhance his punishment. *Estelle v. Smith*, 451 U.S. 454, 462–64, 101 S.Ct. 1866, 1872–73, 68 L.Ed.2d 359 (1981). Mullen may have feared that his testimony concerning his involvement in the drug transaction at issue or other related transactions would adversely influence this Court's consideration of his sentence. A defendant who has pleaded guilty but who is awaiting sentencing may invoke the Fifth Amendment privilege against self-incrimination in order to prevent the possible enhancement of his sentence. *See Estelle v. Smith*, 451 U.S. at 462–64, 101 S.Ct. at 1872–73; *United States v. Gibbs*, 739 F.2d at 848–49, 853;

*United States v. Zirpolo,* 704 F.2d 23, 25 n. 2 (1st Cir.1983); *Jones v. Cardwell,* 686 F.2d 754, 756 (9th Cir.1982); *United States v. Lowell,* 649 F.2d 950, 955 (3d Cir.1981); *United States v. Trejo-Zambrano,* 582 F.2d 460, 464 (9th Cir.), *cert. denied* 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978); *United States v. Cubberly,* Cr. No. 83–179–02, slip op. at 3 (E.D.Pa. September 23, 1983), *aff'd mem.* 735 F.2d 1351 (3d Cir.1984).

In addition to preventing his testimony from being used against him at sentencing, the Court believes that Mullen legitimately might have feared that his testimony with respect to the drug transaction in this case could lead to evidence incriminating him in other drug transactions. Since Mullen's testimony might have subjected him to future prosecution arising from the transaction at issue or from other related drug transactions, his Fifth Amendment privilege was valid. *United States v. Lowell,* 649 F.2d at 961 n. 20; *United States v. Yurasovitch,* 580 F.2d 1212, 1218 (3d Cir. 1978). Since the Fifth Amendment privilege may be invoked by a defendant in any proceeding "where the answers might incriminate him in future criminal proceedings," *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274 (1973), and given "the extraordinary degree to which [the privilege] protects witnesses from even the weakest threat of incrimination", *United States v. Lowell,* 649 F.2d at 963, it is clear that Mullen's invocation of the privilege was valid, and that therefore he was "unavailable" for purposes of the Confrontation Clause.

Finally, although the defendants did not contest the reliability of Mullen's hearsay statements, it is clear that those statements satisfied the indicia of reliability required by the Confrontation Clause. *See United States v. Ammar,* 714 F.2d at 255–57. The defendant's contention that he was denied his rights under the Confrontation Clause is without merit.

*Prosecutorial Misconduct*

■ Wilson also contends that the prosecutor's reference to "Angelo Bruno" in his rebuttal summation was unduly prejudicial and denied him a fair trial because by that reference the prosecutor "likened" the defendant's activities to "organized crime." This contention is without merit. In his closing argument Wilson's counsel argued to the jury that Wilson could not have been involved in this large quantity drug transaction because, *inter alia,* he lived in a "small rowhouse." Counsel referred to the size of Wilson's house seven times in his closing argument. In response to this argument the prosecutor in his rebuttal stated "Angelo Bruno, the reputed head of the Mafia, lived in a rowhouse in Philadelphia for decades". (Tr., October 5, 1984, at 18). The prosecutor referred to Bruno's house only to rebut Wilson's argument that people involved in large drug transactions do not live in rowhouses. The prosecutor made no attempt to link Wilson with "organized crime" as contended by the defendant. The prosecutor's isolated remark, viewed "in the context of the entire trial", was not "sufficiently prejudicial to violate defendant's due process rights". *United States v. Scarfo,* 685 F.2d 842, 849 (3d Cir.1982). *See also United States v. DiPasquale,* 740 F.2d 1282, 1295–96 (3d Cir. 1984).

Although the Court has not discussed herein all of the contentions of alleged error raised by the defendant, the Court has considered each and every allegation of error and has determined that none of them, singly or collectively, is of sufficient substance to merit any further discussion as a basis for granting the defendant's motion for a new trial.

For all of the reasons set forth above the Court has determined that defendant Wilson's motion for a judgment of acquittal, or in the alternative for a new trial, will be denied.