**In re GI YEONG NAM, Debtor.**

**Marvin Krasny, Plaintiff,**

**v.**

**Gi Nam and Yeong Nam, Defendants.**

**Bankruptcy No. 99–16565DWS.**
**Adversary No. 99–0815.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Feb. 11, 2000.

Eric L. Frank, Philadelphia, PA, for Defendants.

Steven M. Schain, Philadelphia, PA, for Plaintiff, Chapter 7 Trustee.

Marvin Krasny, Philadelphia, PA, Chapter 7 Trustee.

Dave P. Adams, Office of the U.S. Trustee, Philadelphia, PA, for United States Trustee.

### *OPINION*

DIANE WEISS SIGMUND,
Bankruptcy Judge.

Before the Court is the Plaintiff/Trustee Marvin Krasny's Motion to Compel Responses to Discovery Requests ("Motion"). The Motion challenges objections made to the discovery requests based on the Fifth Amendment right against self-incrimination. A hearing on the Motion was held on December 7, 1999; no evidence was offered but each party presented argument. For the reasons set forth below, I deny the Motion.

### BACKGROUND

Defendants, Gi Nam ("Debtor") and Yeong Nam (collectively Debtor and Yeong Nam shall be referred to hereinafter as "Defendants"), are married. Their son, David Nam, was charged with several criminal offenses in connection with a robbery and murder. Complaint ¶ 11 & Exhibit A; Defendants' Answer to Complaint ("Answer") ¶ 11. Pursuant to a Certification of Bail and Discharge ("Bail Surety Agreement") signed on January 12, 1998, Debtor agreed to serve as surety for the $1,000,000 bail set as a condition for his son's release from jail. *Id.* On April 6,

1998, after the Debtor's son failed to appear for a pre-trial status listing regarding the aforementioned criminal charges, a judgment ("Judgment") for $1,000,018.50 was entered against Debtor. Complaint ¶ 13; Answer ¶ 13. As of April 6, 1998 to the present, Debtor's debts exceeded his assets. Complaint ¶ 14; Answer ¶ 14.

On May 19, 1999, Debtor filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code. Complaint ¶ 3; Answer ¶ 3. Debtor listed the Judgment in his Schedules.

On June 11, 1999, the Chapter 7 Trustee, Marvin Krasney ("Trustee"), commenced this adversary proceeding against Debtor and his wife by filing a complaint ("Complaint"). The Complaint contains two counts. Count I is based on 11 U.S.C. § 548(a)(1) and alleges that within one year before filing his bankruptcy case, Debtor "transferred assets for the purpose of hindering, delaying or defrauding creditors including the City." Complaint ¶ 21. Count II is based on 11 U.S.C. § 544(a) and the Pennsylvania Uniform Fraudulent Transfer Act. In this Count, the Trustee asserts that Debtor and his wife made transfers of Debtor's assets, without adequate consideration, in order to defraud the City and prevent it from recovering on the Judgment. *Id.* at ¶ 27–32.

On August 9, 1999, Debtor testified at the § 341 hearing for creditors. Motion ¶ 3; Defendants' Answer to Plaintiff's Motion to Compel Discovery Against Defendants ("Defendants' Answer") ¶ 3. He was questioned by the Trustee and his counsel, Steven Schain, Esquire. Transcript from § 341 Hearing, dated 8/9/99 ("Transcript, 8/9/99"). In response to these individuals' questions, Debtor stated in relevant part:

Q. Mr. Nam, what caused you to file bankruptcy?

A. Because I owe million dollars to the City. I cannot really pay for it.

\* \* \* \* \* \*

Q. In the year preceding that May 1999 bankruptcy, did you travel outside of the United States?

A. Yes.

Q. Where did you go?

A. South Korea

\* \* \* \* \* \*

Q. How many times did you go to South Korea?

A. Two times.

\* \* \* \* \* \*

Q. When?

A. As I believe, March the 4th, first time. Second time, April something. I actually do not remember what date.

Q. Would both the March date and the April date be in the calendar year 1999?

A. That's correct.

Q. Did you go to Korea by yourself?

A. With my wife in March. April, yes, I go with my wife.

\* \* \* \* \* \*

Q. For what purpose did you to South Korea?

A. First time because my son turned into police department. We went to see what's going on. That's why my wife and I go.

\* \* \* \* \* \*

Q. How about the second time?

A. Second time because my lawyer— his name is Jeffrey Landis told me—

Mr. Frank [Debtor's counsel]: Let me stop you. You shouldn't say—you're not to testify concerning your conversations with Mr. Landis.

Q. If you can, Mr. Nam, without discussing what your lawyer told you, can you tell me the general reason for the second trip?

A. Because return to ask my son to come back and (inaudible).

Q. What did he say?

A. He don't want to come back to America.

Q. How long were you in Korea the first time this year?

A. Total four weeks.

\* \* \* \* \* \*

Q. How many weeks on your first March of 1999 trip?

A. Three weeks.

Q. Would it be fair to say the second trip was only for one week?

A. Yes.

Q. You mentioned earlier that one of the reasons you're in bankruptcy is you owe the City money, correct?

A. Yes.

Q. When did you first become aware that you owed the City money?

A. I think my knowledge, this year, January 15th come around. I first time knew Philadelphia—City want to sue me.

Q. If I understand you correctly, are you saying you first became aware March 15th of 1999?

A. Yes.

Q. So you didn't know prior to that—

A. No, at all.

Q. Do you remember entering into an agreement—a (inaudible) agreement with the City?

A. Because I do not really know about English that they paper. I cannot able to read more. So what actually saying that, I do not know.

\* \* \* \* \* \*

Q. If I'm reading that correctly, in 1998, you declared your son, David, a dependent?

A. Because—

Mr. Frank: Wait. Just answer the question. Did you declare him—

The Witness: Yes.

Mr. Frank:—as a dependent?

The Witness: Yes.

Mr. Frank: Okay.

Q. Why is that?

A. 1998, I often go to the jail. I give to him all the money. I provide all the clothes. When he come home, I provide everything, so I thought I was allowed to claim as my dependent.

\* \* \* \* \* \*

Q. Did you pay any money to anyone in Korea during your trips in the last year?

A. Yes.

Q. Who did you pay money to?

A. My mother.

Q. Your mother?

A. Yeah. Not pay, it is present. It is—culture to obey parents. I should give it to present. It is not pay. It is a present. She is 83.

\* \* \* \* \* \*

Q. So you didn't pay any money to an attorney to represent your son?

A. No, I didn't. My wife did.

Q. Oh. Do you know how much your wife paid?

A. As I believe, I actually don't know. I know paid more than 10,000.

\* \* \* \* \* \*

Q. Other than the money paid by your wife to the lawyer in South Korea and other than the money that you gave to your mother, did either you and your wife spend any money in South Korea other than for food—

A. Actually—

Q. - and shelter?

A. —we give it to my mother. My wife did it because in my culture, man doesn't do that. Wife (inaudible) all the family, so money is actually—when trip leaving somebody, man don't do it.

*Id.* at 7–13, 16–17.

On August 11, 1999, the Trustee served a set of interrogatories and document requests on each of the Defendants. Motion ¶ 4; Defendants' Answer ¶ 4. On or about September 25, 1999, Defendants served re-

sponses to the discovery requests. Motion ¶ 7; Answer ¶ 7. *See also* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel Discovery ("Defendants' Memorandum") at 7 (stating that on September 24, 1999, Defendants served responses to the Trustee's discovery requests). On November 15, 1999, the Trustee filed his Motion contending that Defendants failed to fully respond to the discovery requests and seeking an order compelling them to do so. More specifically, the Trustee seeks to compel Debtor to fully respond to Interrogatory Nos. 12, 13 and 17 and his wife to fully respond to Interrogatory Nos. 13 and 17.[1] In response to these interrogatories, Debtor and his wife each raised an objection based on their Fifth Amendment right against self-incrimination. Interrogatory Nos. 12, 13 and 17 and Debtor's answers to them follow:

12. Identify and describe in great detail your understanding of the Bail Sure-

1. In his Motion, the Trustee also sought to compel full and complete answers to Interrogatory Nos. 14 and 15 and to Document Request No. 9. To the extent Interrogatory Nos. 14 and 15 sought information concerning communications, Defendants objected thereto based on the marital privilege and the attorney-client privilege. At the hearing on this matter, the Trustee's counsel advised the Court that the Trustee was not challenging the Defendants' invocation of the marital privilege or the attorney-client privilege, but rather, was limiting his challenge to the assertion of their Fifth Amendment right against self-incrimination. Since the Defendants' response to Interrogatories Nos. 14 and 15 do not mention their Fifth Amendment right against self-incrimination, I assume, based on the Trustee's counsel's representation, that the Trustee is no longer pursuing relief in his Motion regarding Defendants' responses to these particular interrogatories.

Document Request No. 9 demanded Defendants to produce "[a]ll documents comprising any communications from or to David Nam at any time during the last twenty (20) months." In response to this document request, Defendants referred to Gi Nam's response to Interrogatory No. 17 which was "Defendant Gi Nam objects to this Interrogatory for the reasons set forth in the General Objections No. 1 and the federal and state constitutional privileges against self-incrimination." In Defen-

ty Agreement including, but not limited to, when you became aware of it, what its terms are, why you entered into it, what obligation it imposed, what money you intended to pay yours [*sic*] $1,000,-000 obligation upon entering into the agreement and all communications you had with Yeong Nam, David Nam, or anyone else regarding the Bail Surety Agreement.

*Debtor's Answer:* Defendant Gi Nam understood the bail agreement to mean that in the event that his son did not appear for court, he would lose the $100,000 he had paid for the bail bond. He did not understand that he would be liable for more than $1 million if his son did not appear for court. Based on General Objection No. 1,[2] marital privilege, federal and state constitutional privileges against self-incrimination and attorney-client privilege, Defendant objects to this Interrogatory's request for information concerning communications.[3]

dants' Memorandum, they represent that, without waiving any privileges they have asserted, they will file a supplemental response to Document Request No. 9 stating that no such documents exist. *See* Defendants' Memorandum at 20–21. Based on this representation, I need not address the Trustee's challenge to Defendants' response to Document Request No. 9.

Notably, Defendants only partially answered Interrogatory No. 18 and raised objections thereto based on "General Objection Nos. 1 and the federal and state constitutional privilege against self-incrimination." However, the Motion does not challenge Defendants' response to this interrogatory.

2. "General Objection No.1" stated:

Defendant Gi Nam objects to these Interrogatories on the grounds that: the information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence; the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation and the importance of the proposed discovery in resolving the issues.

Defendant Gi Nam's Answers to Plaintiff's Interrogatories at 1.

13. Identify and describe in great detail your understanding of the Judgment including, but not limited to, when you became aware of it, what money you intended to pay your $1,000,000 obligation, and all communications you had with Yeong Nam David Nam, or anyone else regarding the Judgment.

*Debtor's Answer:* Defendant Gi Nam did not understand that a judgment had been entered against him until he received some papers in the mail from Steven Schain in January 1999. Based on General Objection No. 1, marital privilege, federal and state constitutional privileges against self-incrimination and attorney client privilege, Defendant objects to this Interrogatory's request for information concerning communications.

17. Identify and describe in great detail all communications you have had with David Nam following his January 1997 arrest including, but not limited to, the dates of each communication, the

substance of each communication, and if oral, the location of each communication. *Debtor's Answer:* Defendant Gi Nam objects to this Interrogatory for the reasons set forth in Objection No. 1 and federal and state constitutional privileges against self-incrimination.[4]

The same (Interrogatory No. 17) or nearly identical (Interrogatory No. 13) interrogatories were directed to Yeong Nam. In response to Interrogatories Nos. 13 and 17, she relied upon her husband's responses to the same.[5]

█ The Trustee contends that Defendants should be compelled to fully and completely answer the interrogatories at issue because Defendants have not justifiably invoked their Fifth Amendment right against self-incrimination. In the alternative, the Trustee asserts that, by testifying at the § 341 hearing regarding his communications with his son, the Bail Surety Agreement and the Judgment, Gi Nam waived any claim of privilege as to those subjects.[6]

3. It is apparent from Debtor's response to Interrogatory No. 12 that he objects to identifying any communications which he had with his wife or son regarding the Bail Surety Agreement because he considers such communications privileged. *See* Defendant's Memorandum at 12 (explaining that defendants have invoked their right against self-incrimination only as to their communications with their son). However, the interrogatory also asks Debtor to identify and describe all communications which he had on the same subject with "anyone else." Based on Debtor's answer, it is impossible to ascertain whether Debtor objects, based on General Objection No. 1, to revealing communications with "anyone else" or whether no such communications are identified because none occurred.

4. Significantly, the breadth of this interrogatory is not at issue here. The only issue before me is whether Defendants' objection based on their privilege against self-incrimination is valid and, as to Debtor, whether he waived the right to object on that basis.

5. Interrogatories Nos. 13 and 17 to Yeong Nam and her answers thereto are as follows:
 13. Identify and describe in great detail your understanding of the Judgment in-

cluding, but not limited to, when you became aware of it, what money Gi Nam intended to pay his $1,000,000 obligation, and all communications you had with Gi Nam, David Nam, or anyone else regarding the Judgment.
 *Yeong Nam's Answer: See* Defendant Gi Nam's Answers to Plaintiff's Interrogatories Nos. 13–18.
 17. Identify and describe in great detail all communications you have had with David Nam following his January 1997 arrest including, but not limited to, the dates of each communication, the substance of each communication, and if oral, the location of each communication. *Yeong Nam's Answer: See* Defendant Gi Nam's Answers to Plaintiff's Interrogatories Nos. 13–18.

6. The Trustee also argues that Defendants waived their right against self-incrimination by failing to provide a privilege log as required by his document requests and Fed. R.Civ.P. 26(b)(5), which is made applicable to adversary proceedings pursuant to Fed. R.Bankr.P. 7026. However, as noted *infra* at 227, a waiver of the right against self-incrimination is not be lightly inferred. Here, Defendants invoked the right in their responses to the interrogatories. While Defendants were

## DISCUSSION

### I. *Invocation of Fifth Amendment Right Against Self–Incrimination*

 The Fifth Amendment right against self-incrimination can be invoked "in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory[.]" *Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The right protects against disclosures "which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Id.* at 444–45, 92 S.Ct. 1653. *See also Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) (the right against self-incrimination can be invoked whether the answer would in itself support a criminal conviction or would furnish a link in the chain of evidence needed to prosecute for a crime); *Hashagen v. United States*, 283 F.2d 345, 348 (9th Cir.1960) ("[T]he privilege to remain silent may also be validly asserted where the answer to a question would be likely to provide a lead or clue to a source of evidence of such crime, and thus furnish a means of securing one or some of the 'links in a chain of evidence' required for federal prosecution of the witness."). The privilege "protects federal witnesses against incrimination under state as well as federal law." *United States v. Johnson*, 488 F.2d 1206, 1209 (1st Cir.1973) (*citing Kastigar v. United States, supra*, 406 U.S. at 456–67, 92 S.Ct. 1653). *See also United States v. Balsys*, 524 U.S. 666, 670–72, 118 S.Ct. 2218, 2222, 141 L.Ed.2d 575 (1998) (privilege against self-incrimination can be asserted in any proceeding "in which the witness reasonably believes the information sought, or discoverable as a result of his testimony, could be used in a subsequent state or federal criminal proceeding."); *In re French*, 127 B.R. 434, 435 (Bankr.D.Minn.1991) (debtor may refuse to answer questions posed during statutory § 341 meeting of creditors based on valid assertion of fifth amendment privilege against self-incrimination.) [7] The Third Circuit explained the purpose behind the rule in *United States v. Yurasovich*, 580 F.2d 1212 (3d Cir.1978), stating:

> The privilege against self-incrimination embodies the decision of our society to opt for an adversarial rather than an inquisitorial system of justice. The principle adopted is that "it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with assistance of enforced disclosures by the accused."

*Id.* at 1215 (*quoting Ullmann v. United States*, 350 U.S. 422, 427, 76 S.Ct. 497, 100 L.Ed. 511 (1956)).

 The individual asserting the privilege against self-incrimination is not "required to prove the hazard in the sense in which a claim is usually required to be established in court" since if he were so required, "he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman v. United States, supra*, 341 U.S. at 486, 71 S.Ct. 814. Rather, "to sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 486–87, 71 S.Ct. 814. In ruling on the validity of an assertion of the privilege, the court " 'must be governed as much by [its] personal perception of the peculiarities of the case as by the facts

---

obligated to comply with Rule 26(b)(5), the Trustee has failed to cite any case holding that a party which asserted its Fifth Amendment privilege in response to interrogatories waived the privilege by failing to provide a privilege log. In the absence of controlling authority, I will not so hold.

7. Indeed when a debtor has not been granted immunity from prosecution, Code §§ 344 and 727(a)(6) allow him to invoke his fifth amendment privilege and still receive his discharge. *In re Blan*, 239 B.R. 385, 391 (Bankr. W.D.Ark.1999).

actually in evidence.'" *Id.* at 487, 71 S.Ct. 814 (*quoting Ex parte Irvine*, 74 F. 954, 960 (C.C.S.D.Ohio 1896)) (Taft, J.). Invocation of the privilege must be upheld unless it is "'perfectly clear, from a careful consideration of all the circumstances of the case, that the witness is mistaken, and that the answer(s) cannot possibly have such tendency' to incriminate." *Hoffman v. United States, supra*, 341 U.S. at 488, 71 S.Ct. 814.

In *American Cyanamid Company v. Sharff*, 309 F.2d 790 (3d Cir.1962), the Third Circuit utilized a two-step inquiry for assessing the validity of a witness' invocation of his or her right against self-incrimination. The first inquiry is to determine whether there appears to be a conceivable possibility that the witness could be linked to a crime. *Id.* at 794. If so, then the court must decide "whether the questions asked have a tendency to incriminate." *Id.* In the instant case, I have no difficulty in concluding that both of these requirements are met.

According to the Defendants, they fear their responses to the interrogatories could provide links in the chain of a prosecution against them because their son is a fugitive. They identify both federal and state statutes which make it a crime to assist a fugitive in avoiding prosecution or apprehension. The relevant federal statutes are 18 U.S.C. § 1073 and 18 U.S.C. § 2(a). Section 1073, entitled "Flight to avoid prosecution or giving testimony," provides:

Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death or which is a felony under the laws of the place from which the fugitive flees, or (2) to avoid giving testimony in any criminal proceedings in such place in which the commission of an offense punishable by death or which is a felony under the

laws of such place, is charged, or (3) to avoid service of, or contempt proceedings for alleged disobedience of, lawful process requiring attendance and the giving of testimony or the production of documentary evidence before an agency of a State empowered by the law of such State to conduct investigations of alleged criminal activities, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1073. Section 2(a) states: "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). The relevant state statute, titled "Hindering apprehension or prosecution," provides, in pertinent part:

(a) Offense defined.—A person commits an offense if, with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime or violation of the terms of probation, parole, intermediate punishment or Accelerated Rehabilitative Disposition, he:

(1) harbors or conceals the other;

(2) provides or aids in providing a weapon, transportation, disguise or other means of avoiding apprehension or effecting escape;

\* \* \* \* \* \*

(4) warns the other of impending discovery or apprehension, except that this paragraph does not apply to a warning given in connection with an effort to bring another into compliance with law; or

(5) provides false information to a law enforcement officer.

18 Pa.C.S. § 5105.

Based on the circumstances present here, it is conceivable that Defendants could be linked with the federal or state crime for aiding and abetting flight to avoid prosecution. The Debtor's testimony from the § 341 hearing reveals that: (i) while his son was incarcerated, Debtor

supplied him with money and clothes; and (ii) after Debtor's son was released on bail, he resided with the Defendants and they provided him with "everything." Transcript, 8/9/99, at 13–14. The testimony also reveals that after their son fled to South Korea and turned himself in to the police, Defendants traveled to the country to "see what's going on" and that Yeong Nam paid a lawyer there more than $10,-000 to represent the son. *Id.* at 8–9, 17, 23. Considering the assistance which Defendants provided to their son during his incarceration and afterwards, and that he lived with them before fleeing to South Korea, it is a "conceivable possibility" that Defendants could be linked to either a federal or state crime for assisting him in avoiding prosecution and fleeing the country.

Having met the first prong of the inquiry established in *Sharff,* I must turn to the second prong: whether the facts sought to be elicited by the interrogatories at issue could form a link in the chain of evidence necessary to convict the Defendants of the criminal statutes set forth above. In Interrogatory No. 12, Debtor is asked to identify and describe all his communications with his son regarding the Bail Surety Agreement. If Debtor intended to aid his son in fleeing to South Korea after being freed on bail, Debtor's answer to this interrogatory could incriminate him by revealing as much. Debtor and his son could have discussed Debtor's obligations under the Bail Surety Agreement; during such a discussion Debtor could have communicated to his son that he was willing to bear the penalty imposed under the agreement if his son fled.

Interrogatory No. 13 requires Defendants to identify and describe all communications which they had with their son regarding the Judgment. This interrogatory could elicit incriminating evidence in the same manner as Interrogatory No. 12. If Defendants encouraged their son to flee the country, assisted him in fleeing or simply supported his decision not to return

to the United States, they may have had discussions with him regarding the Judgment, advising him that they were willing to bear the burden of the Judgment in order for him to avoid prosecution. Such communications would tend to be incriminating.

The final interrogatory at issue is Interrogatory No. 17 which asks the Defendants to identify and describe in detail "all communications [they] have had with [their son] following his 1997 arrest[.]" Obviously, if Defendants aided their son in fleeing the jurisdiction and avoiding prosecution, they may have had communications with him that would incriminate them (*e.g.,* communications about the details of his flight, who he should contact in South Korea to obtain support, etc.). Such communications would fall within the scope of this broad-based interrogatory.

Thus, Defendants' invocation of their Fifth Amendment right against self-incrimination to Interrogatory Nos. 12, 13 and 17 was valid. I turn to the Trustee's argument on waiver.

## II. *Waiver of Fifth Amendment Right*

The Trustee contends that Debtor waived his Fifth Amendment right against self-incrimination as to his conversations with his son, his understanding of the Bail Surety Agreement and the Judgment by testifying regarding the same at the § 341 meeting. Debtor raises two arguments in opposition to this contention. First, Debtor contends that his testimony at the § 341 meeting cannot serve as a waiver of his privilege against self-incrimination because this adversary proceeding constitutes a separate and independent proceeding from the § 341 meeting. In the alternative, Debtor argues that, even if the § 341 meeting was not a separate proceeding from this adversary, he did not waive his Fifth Amendment right by testifying at the § 341 meeting about his communications with his son because there was nothing incriminating in that testimony and requiring further testimony from him regarding his contacts and communications

with his son would increase the risk of incrimination.

The Fifth Amendment privilege against self-incrimination is not self-executing. *Roberts v. United States*, 445 U.S. 552, 559, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980). The privilege can be waived by failing to invoke it in a timely fashion and by disclosure of incriminating evidence.[8] *Rogers v. United States*, 340 U.S. 367, 373, 71 S.Ct. 438, 95 L.Ed. 344 (1951). Once a witness voluntarily reveals an incriminating fact, the privilege cannot be invoked to avoid disclosing the details of that fact unless the witness' answer to the particular question posed would subject him or her to a "real danger" of further incrimination. *Id.* at 373–74, 71 S.Ct. 438. Explaining these principles in *Rogers v. United States*, the Supreme Court stated:

> [F]ederal courts have uniformly held that, where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details. . . . Requiring full disclosure of details after a witness freely testifies to a criminating fact does not rest upon a further "waiver" of the privilege against self-incrimination. Admittedly, petitioner had already "waived" her privilege of

silence when she freely answered criminating questions relating to her connection with the Communist Party. But when petitioner was asked to furnish the name of the person to whom she turned over Party records, the court was required to determine, as it must whenever the privilege is claimed, whether the question presented a reasonable danger of further incrimination in light of the all of the circumstances, including any previous disclosures. As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a "real danger" of further incrimination.

*Rogers v. United States, supra,* 340 U.S. at 373–74, 71 S.Ct. 438. Thus, before precluding a witness from invoking his Fifth Amendment right against self-incrimination after he has provided voluntary testimony in the same proceeding, a court must find that: (i) the question seeks details about incriminating facts to which the individual has already testified; and (ii) the witness' answer to the particular question posed would not tend to further incriminate him.[9]

8. In *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), the Supreme Court ruled that when a witness voluntarily takes the stand and offers testimony on her own behalf, even if her testimony is *not* incriminating, she waives the right to assert her privilege against self-incrimination in response to cross-examination on matters raised by her testimony. Explaining the rationale for this rule, the Supreme Court stated:

> [W]hen a witness voluntarily testifies, the privilege against self-incrimination is amply respected without the need of accepting testimony freed from the antiseptic test of the adversary process. The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice, but, if he elects to testify, an immu-

> nity from cross-examination on the matters he himself has put in dispute.

*Id.* at 155–56, 78 S.Ct. 622. *See also United States v. Herrera–Medina*, 853 F.2d 564, 567–68 (7th Cir.1988) ("For having decided to testify, a witness cannot assert the Fifth Amendment privilege with respect to specific questions if they are within the scope of his testimony; he cannot deprive the opposing party of the right of cross-examination."). Unlike the petitioner in *Brown*, the Debtor here, appearing at the § 341 meeting as required by 11 U.S.C. § 343 and being examined by the Trustee and his counsel, did not choose the areas upon which he was examined. *See McCarthy v. Arndstein*, 262 U.S. 355, 359, 43 S.Ct. 562, 67 L.Ed. 1023 (1923).

9. Reading this and other decisions of the United States Supreme Court, the Second Circuit Court of Appeals in *Klein v. Harris*, 667 F.2d 274, 287 (2d Cir.1981) formulated the following two prong test to determine whether a court should infer a waiver of the fifth amendment's privilege against self incrimina-

 A testimonial waiver of an individual's Fifth Amendment right is not to be lightly inferred. *DG Corp. v. Dabah (In re DG Acquisition Corp.),* 151 F.3d 75, 80 (2d Cir.1998). As the Supreme Court has repeatedly admonished, courts must indulge every reasonable presumption against finding testimonial waiver. *Emspak v. United States,* 349 U.S. 190, 197, 75 S.Ct. 687, 99 L.Ed. 997 (1955).

### (i) Separate Proceedings

 The possibility that the Debtor's testimony at the § 341 meeting effected a waiver of his Fifth Amendment privilege to refuse to answer interrogatories propounded in the pending adversary proceeding exists only if the § 341 meeting and adversary proceeding are considered successive phases of a single proceeding. In *In re Neff,* 206 F.2d 149 (3d Cir.1953), the Third Circuit held that a waiver of one's right against self-incrimination in one proceeding is not a waiver of the right in a separate proceeding, stating:

> It is settled by the overwhelming weight of authority that a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or proceeding. The privilege attaches to the witness in each particular case in which he may be called on to testify, and whether or not he may claim it is to be determined without reference to what he said when testifying as a witness on some other trial, or on a former trial of the same case, and without reference to his declarations at some other time or place.

*Id.* at 152. *See also United States v. Gary,* 74 F.3d 304, 312 (1st Cir.) (stating that it is "hornbook law" that a witness' waiver of his right against self-incrimination is limited to the particular proceeding in which the witness appears), *cert. denied,* 518 U.S. 1026, 116 S.Ct. 2567, 135 L.Ed.2d 1084 (1996). The issue in *In re Neff* was whether a witness who had answered certain questions during a grand jury proceeding which had led to the indictment of the defendant on trial had waived her right to invoke the privilege against self-incrimination in response to the same questions posed to her during the criminal trial. 206 F.2d at 150. Reasoning that the grand jury proceeding was "wholly separate and distinct from, and of a different nature than, the subsequent trial of the defendant," the Third Circuit concluded that the witness had not waived her Fifth Amendment right. *Id.* at 152. The Court then explained the rationale for this rule:

> Indeed [Neff's] case is a striking illustration of the importance of the rule in preserving the constitutional privilege against self-incrimination. For between the time of the defendant's testimony before the grand jury and her claim of privilege at Valentino's trial she had been convicted of perjury before the grand jury and had been sentenced to a total of ten years' imprisonment. Thus the setting in which the questions were asked of her had greatly changed and she could well have had apprehensions as to the incriminating effect of her requested testimony which she did not have on the earlier occasion.

tion from a witness' prior statements: "(1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination." While not expressly adopted by this Circuit and indeed rejected by the Bankruptcy Court in *Teitelman v. Dale Petroleum (In re A & L Oil Co., Inc.),* 200 B.R. 21, 25 (Bankr.

D.N.J.1996), as adding elements to *Rogers* not enunciated by the Supreme Court, the Second Circuit's formulation has gained widespread acceptance by other courts. *See, e.g., United States v. Singer,* 785 F.2d 228, 241 (8th Cir. 1986); *Conant v. McCaffrey,* 1998 WL 164946 *6 (N.D.Cal.1998); *Mitchell v. Zenon Construction Co.,* 149 F.R.D. 513, 514 (D.Vi. 1992); *In re Mudd,* 95 B.R. 426, 428 (Bankr. N.D.Tex.1989) (citing other bankruptcy courts to adopt test).

*Id.* at 152–53.[10] The reason for the rule was also discussed in *United States v. Steffen,* 103 F.Supp. 415 (N.D.Cal.1951), quoting from *People v. Cassidy,* 213 N.Y. 388, 107 N.E. 713, 715 (1915):

> 'A person who is entitled to the benefit of the constitutional provisions is so entitled in each new and independent proceeding; otherwise he would subject himself to a new cross-examination and be required under new and changed conditions to give testimony that may not have been anticipated or intended in subjecting himself to examination as a witness in a prior and different proceeding.'[11]

At the hearing on the Motion, Debtor's counsel stated that he could find no cases discussing the separate proceeding doctrine in the bankruptcy context. My independent research on the issue revealed otherwise. While none of these cases present the factual scenario here, they offer useful background. In *In re Hulon,* 92 B.R. 670, 674 (Bkrtcy.N.D.Tex.1988), the debtor asserted his Fifth Amendment privilege at a court ordered trustee's Rule 2004 examination which followed the § 341 meeting at which he freely testified. The *Hulon* court referred to the fact that the statutes creating bankruptcy jurisdiction distinguish between the terms "case" and "proceeding" and that many proceedings may be brought in any given case. It noted that the Rule 2004 examination was in furtherance of the trustee's investigation of possible fraudulent conveyances and preferential transfers made by the debtor which would have to be commenced by a separate adversary proceeding. While such a proceeding would relate to the § 341 meeting, it "would not necessarily be the same 'proceeding' as the § 341 meeting governing the administration of the case. Consequently, the waiver concept may not apply in serial proceedings in a bankruptcy case." *Id.* at 673. Notwithstanding that observation, the Court found that even assuming the § 341 meeting and Rule 2004 examination were the same proceeding, the debtor had not waived the privilege. *See also Interim Investors Committee v. Jacoby,* 90 B.R. 777, 779 (W.D.N.C.1988) (noting that substantial authority supported the bankruptcy court's determination that defendant's testimony at a hearing in the main bankruptcy case was ineffective to waive her assertion of her Fifth Amendment right against self-incrimination in an adversary proceeding), *order aff'd,* 914 F.2d 1491 (4th Cir.1990). On the other hand, the bankruptcy court in *In re Mudd,* 95 B.R. 426, 430–31 (Bankr. N.D.Tex.1989), concluded that testimony at several prior § 341 meetings and Rule 2004 examinations occurred in the "same judicial proceeding" because the "subject matter of the adversary proceeding—the loss of some $9,000,000 from [two bank accounts]—is so interwoven with the main Bankruptcy proceeding that the two proceedings are part and parcel of each other." The court in *In re Blan,* 239 B.R. 385, 395–396 (Bankr.W.D.Ark.1999), recog-

**10.** The Third Circuit discussed its ruling in *Neff* some years later in *United States v. Yurasovich,* 580 F.2d 1212, 1219 & n. 33 (3d Cir.1978). Referring to the overwhelming authority that holds that "a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or matter," it also recognized *Ellis v. United States,* 416 F.2d 791, 805 (D.C.Cir.1969), a case that had rejected *Neff* as "formalistic." In *Ellis,* the district court eschewed the "mechanical rule" enunciated in *Neff,* opting to require a "realistic" appraisal of whether the passage of time between the two investigations and change of conditions opens up new real dangers. *Id.* at 802. In applying *Neff* in this case, the Third Circuit implicitly rejected the factual inquiry advocated by *Ellis* in favor of the bright line rule it had previously adopted.

**11.** The *Neff* Court likewise relied on state appellate decisions as the issue had not yet been presented to a federal appellate court. It was satisfied that the state court rule under similar state constitutional provisions was equally applicable under the Fifth Amendment. 206 F.2d at 152. Since *Neff,* the separate proceeding rule has been repeatedly intoned as hornbook law without much, if any, discussion of its policy underpinnings.

nizing, but not commenting on, the *Hulon* and *Mudd* discussions of this issue, concluded that while statements which the debtor made at the § 341 meeting were "arguably 'testimonial'" since they were made voluntarily under oath in the "same judicial proceeding" as a Rule 2004 examination, it could not find those statements criminating. Absent such finding, no waiver could be found under the test articulated in *Klein v. Harris*. Notably other than *Mudd*, none of these cases were controlled by resolution of the separate proceedings issue.

Finally, in *Charter Federal Savings Association v. Rezak (In re Lederman)*, 140 B.R. 49 (Bankr.E.D.N.Y.1992), the Court considered whether the debtor's admission made in his Chapter 11 disclosure statement that he had disclosed all his books and records to the creditors' committee and its accountants evidenced a waiver of the privilege against self-incrimination in connection with a document request made in subsequent dischargeability litigation. The Court noted that the approved disclosure statement evidenced the debtor's willingness to disclose all materials in order to compile a document to be provided to creditors since there was no indication therein that certain documents that may incriminate were excluded. The Court recognized that while a waiver may be implied with regard to the proceedings in which the voluntary actions took place, it may not be inferred with respect to separate proceedings. It then turned to the analysis of United States Supreme Court precedent in *United States v. St. Pierre*, 132 F.2d 837 (1942), as support for treating the voluntary production of documents in connection with the disclosure statement as a waiver of the debtor's right to assert the privilege to document production in the adversary proceeding:

> As Learned Hand indicated, however:
> 'In *Arndstein v. McCarthy*, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138 and *McCarthy v. Arndstein*, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023, the question was presented whether a bankrupt's schedules waived his privilege when he was examined ... it was held that they did not, and that he might refuse to answer as to the disposition of his property. *The court apparently treated the schedules and the examination as a single proceeding, else the question of waiver could not have arisen.*'

*Id.* at 54–55, *quoting St. Pierre*, 132 F.2d at 839 (emphasis added).[12]

Unaware of these bankruptcy cases, the Debtor focuses on *Neff*, analogizing a § 341 meeting to a grand jury proceeding. Debtor argues that "just as a witness' testimony in grand jury proceedings cannot serve to waive the witness' Fifth Amendment rights in the resulting criminal trial, so too, testimony at the § 341(a) hearing cannot serve as a waiver of the witness' privilege in subsequent adversary proceedings." Defendants' Memorandum at 17. I acknowledge certain parallels between the two. Like a grand jury, a § 341 meeting is not a judicial tribunal but rather an informing body. Thus, it is of a different nature than the subsequent adversary proceeding that may follow from the information gleaned. *Neff, supra* at 152. However, the analogy fails in at least one important respect found significant by the Third Circuit in *Neff*. When the grand jury concludes its investigation and either returns an indictment or not, its work is done. *Id.*[13] When the trustee concludes

---

12. The Supreme Court did not discuss the separate proceeding issue. However, since the Court found that the schedules contained no incriminating matter so as to cause a waiver of the privilege, it did not have to address the question of whether a waiver as to schedules would be carried forward to the subsequent examination. Thus, the conclusion that the Supreme Court must have necessarily considered the examination and schedules as a separate proceeding is questionable.

13. Rejecting the contention that the trial of a case was a continuation of the investigation begun in the grand jury room so as to be part of the same matter, the court in *Georgia Railroad & Banking v. Lybrend*, 99 Ga. 421, 27 S.E. 794 (1896) noted that the "grand jury is

his § 341 meeting, his role continues as he utilizes the information gained to perform his statutory duties in administering the bankruptcy case, including the commencement of appropriate litigation. Thus, there is a causal connection between the two events, suggesting that the subsequent litigation may lack the requisite independence to qualify as a "separate proceeding." *Compare United States v. Johnson,* 488 F.2d 1206, 1210 (1st Cir.1973) (the Rule 11 hearing was not causally linked to Johnson's trial but an entirely separate proceeding). Indeed the purpose of a § 341 meeting is to "enable creditors and the trustee to determine if assets have been improperly disposed of or concealed or if there are objections to discharge." [14] H.R.Rep. No. 595, 95th Cong., 1st Sess. 332 (1977), U.S.Code cong. & Admin. News 5963, 6288; S.Rep. No. 989, 2d Sess. 42 (1978), U.S.Code Cong. & Admin. News 5787, 5828. *See Avalanche Maritime, Ltd. v. Parekh (In re Parmetex, Inc.)* 199 F.3d 1029, 1035–36 (9th Cir.1999); *Coyne v.*

*Westinghouse Credit Corp. (In re Globe Illumination Co.),* 149 B.R. 614, 616 (Bankr.C.D.Cal.1993); *In re Fulton,* 52 B.R. 627, 631 (Bankr.D.Utah 1985). Accordingly, the scope of the examination is broad, relating to "acts, conduct, property or to the financial condition of the debtor, or to any matter that may affect the administration of the bankruptcy estate or to the debtor's right to a discharge." Fed. R.Bankr.P.2004(b). *See United States v. Webster,* 125 F.3d 1024, 1027 n. 2 (7th Cir.1997). If the § 341 meeting is viewed as a mere preliminary step in the process that culminates in the contested matters and adversary proceedings that flow from the information so elicited, the failure to invoke the Fifth Amendment at the § 341 meeting may significantly undermine a debtor's Fifth Amendment privilege in a bankruptcy case. There would be no principled basis to limit the single proceeding rule to subsequent suits commenced by the trustee. Since the purpose of the § 341 is

---

secret ex parte. What is said there the public is not privileged to hear. That is an entirely different nature than a public trial in open court." *Id.* at 800.

14. Section 341 provides in pertinent part:
 (a) Within a reasonable time after the order for relief in a case under this title, the United States trustee shall convene and preside at a meeting of creditors.

11 U.S.C. § 341. *See also* Fed.R.Bank.P. 2003(b)(1). Section 343 complements this provision:
 Examination of the debtor. The debtor shall appear and submit to an examination under oath at the meeting of creditors under § 341(a) of this title. Creditors, any indenture trustee, any trustee or examiner in the case, or the United States trustee may examine the debtor. The United States trustee may administer the oath required under this section.

Section 341 was amended in 1994 to add the following subsection:
 (d) Prior to the conclusion of the meeting of creditors or equity security holders, the trustee shall orally examine the debtor to ensure that the debtor in a case under chapter 7 of this title is aware of—
 (1) the potential consequences of seeking a discharge in bankruptcy, including the effects on credit history;
 (2) the debtor's ability to file a petition under a different chapter of this title;
 (3) the effect of receiving a discharge of debts under this title; and
 (4) the effect of reaffirming a debt, including the debtor's knowledge of the provisions of section 524(d) of this title.

This amendment was somewhat controversial, being viewed by some as punitive and intending to elicit a "confession" from the debtor acknowledging the adverse consequences to his election to file bankruptcy. A & P Bankr.94 Hearings (6) *115 (March 31, 1993) (position of National Bankruptcy Conference). The legislative history makes clear that this questioning is neither intended nor expected to be coercive, S.Rep.168, 103rd Cong., 1st Sess. (1993), A & P S.Rep. 103–168 *1, and "not intended to be an interrogation to which the debtor must give any specific answers or which could be used against the debtor in some later proceeding." H.R.Rep. No. 835, 103rd Cong., 2nd Sess. (1994), U.S.Code Cong. & Admin. News 3340, 3351, A & P H.R.Rep. 103–835. This history appears to acknowledge the potential for use of information elicited at a § 341 meeting in a subsequent proceeding and at least as to the matters raised by subsection (d), no waiver or admission should be found.

also to afford creditors an opportunity to examine the debtor about his acts, conduct or property, their subsequent suits would likewise be fair game for carrying forward the earlier waiver.

It has been suggested that "a contested matter, an adversary proceeding, or any event that transpires in a bankruptcy case should be considered part of the larger 'bankruptcy proceeding.' In that event, a waiver at any stage of the case would bar the later assertion of the privilege." *Blan, supra,* 239 B.R. at 395. When the separate proceeding doctrine was developed, the prevailing principle was that constitutional privileges may not be waived except as there is awareness of the consequences of the waiver. *United States v. Johnson,* 488 F.2d 1206, 1210 (1st Cir.1973) (*citing, inter alia, Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court limited the knowing and intelligent waiver requirement only to those rights which the Constitution guarantees a criminal defendant, and thus the general wisdom now is that a person may lose the benefit of the privilege against self incrimination without making a knowing and intelligent waiver. *Minnesota v. Murphy,* 465 U.S. 420, 428, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984); *Garner v. United States,* 424 U.S. 648, 654 n. 9, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); *Lederman, supra.* 140 B.R. at 54. Neither the Supreme Court nor the Third Circuit has spoken on the separate proceeding doctrine in the context of a civil proceeding since the erosion of the knowing and intelligent waiver requirement. Since it appears that the policy underpinnings of that doctrine reflect a concern that the witness would not be aware at his initial testimony of claims and actions that may transpire thereafter (*i.e.,* "she could well have apprehensions as to the incriminating effect of her requested testimony which she did not have on the earlier occasion." *Neff, supra,* at 151), it is hard to know whether that concern still persists in a civil proceeding or is as compelling as when the witness' criminal trial rights are at issue.

Assuming that the rationale for the separate proceeding rule is still viable in civil proceedings, it would appear that it would not be served by the broad rule suggested by the *Blan* court. A debtor would have little reason to understand that in responding to the trustee or a creditor's inquiries at a § 341 meeting intended to elicit information pertinent to the administration of his bankruptcy estate and right to discharge, that he would be waiving his Fifth Amendment privilege in all subsequent litigation that ensued in the bankruptcy court. That litigation could be as closely related as the present suit by the trustee to avoid a fraudulent conveyance or as remote as a state law action for intentional interference with contractual relations. In the latter case, the litigation would have been commenced in the state court if the bankruptcy case had not been filed; in other words, the litigation exists wholly apart from the bankruptcy case. In such a situation, it is much easier to view the adversary proceeding as being an independent and separate proceeding from the § 341 meeting. Such circumstance might seem to more strongly support a finding that a debtor was not estopped from asserting his privilege against self-incrimination in the adversary proceeding even though he had freely testified on the same subject at the § 341 meeting than here where the Trustee is seeking to have certain transfers set aside as fraudulent in order to increase the assets available to creditors of the estate. Since it is more difficult to view the present adversary as wholly separate and distinct from the bankruptcy case, one is more likely to conclude, as did the *Mudd* court, that the § 341 meeting and the adversary proceeding are two phases of one proceeding.

 It seems fairly apparent that the trustee should be able to utilize information freely given in the § 341 meeting

in furtherance of his statutory obligations to administer a case. Indeed to hold otherwise would eviscerate the purpose of the § 341 meeting. In this sense, the § 341 meeting cannot be found to be independent of the actions that follow. However, I question whether a debtor should be at risk that any information so volunteered will be freely available in subsequent proceedings that are commenced in the bankruptcy court under the umbrella of his pending case simply because there is "related to" jurisdiction. As stated above, the debtor could have no reason to be aware of that consequence. Thus, there will be times when a § 341 meeting and the litigation that flows therefrom are a unitary proceeding for the purpose of waiver of the Fifth Amendment privilege; however there also may be times when they are not. The instant case falls easily into the former category. The Trustee's action to recover a fraudulent conveyance is causally related to the very purpose of the § 341 meeting which is to elicit information that allows a trustee to discover improper transfers and recover assets for the estate. In focusing on the relationship of the subsequent action to the purpose of the § 341 meeting, I believe a proper balance between the constitutional rights of the debtor and the statutory purposes of the bankruptcy case can be achieved.[15] Accordingly, I hold that to the extent the Debtor waived his privilege by his testimony at the § 341 meeting, it will preclude him from invoking it in this litigation. I turn now to whether there has been such waiver.

### (ii) Waiver

The Trustee contends that by testifying at the § 341 meeting regarding conversations which he had with his son and his understanding of the Bail Surety Agreement and Judgment, Debtor waived his right against self-incrimination as to these subjects. I disagree.

Debtor's testimony regarding the Bail Surety Agreement and Judgment was extremely minimal. It consisted solely of the following:

Q. You mentioned earlier that one of the reasons you're in bankruptcy is you owe the City money, correct?

A. Yes.

Q. When did you first become aware that you owed the City money?

A. I think my knowledge, this year, January 15th come around. I first time knew Philadelphia—City want to sue me.

Q. If I understand you correctly, are you saying you first became aware March 15th of 1999?

A. Yes.

Q. So you didn't know prior to that—

A. No, at all.

Q. Do you remember entering into an agreement—a (inaudible) agreement with the City?

A. Because I do not really know about English that they paper. I cannot able to read more. So what actually saying that, I do not know.

Transcript, 8/9/99, at 10–11. In short, Debtor testified, in response to specific

---

15. As I noted above, *see* page 229 *supra*, in *Hulon, supra,* the Court proffered another possible test, albeit without adopting same. Bankruptcy jurisdiction, it noted, distinguishes between the terms "case" and "proceeding." That separate nomenclature might support the conclusion that proceedings subsequent to the § 341 meeting, while related, are nonetheless separate. This analysis seems to me to be both overinclusive and underinclusive. It brings within the single proceeding rule any matter that can be initiated by motion such as dismissals and excludes any adversary proceeding that is commenced in furtherance of the express goals of the § 341 meeting such as recovery of preferences and fraudulent conveyances and discharge and dischargeability actions. Moreover, since a party that does not object to the commencement of an action by motion as opposed to complaint may be found to have waived that procedural right, the form an action takes does not always accurately reflect its correct procedural posture.

questions posed to him by the Trustee and his counsel, that he first became aware of the Judgment in January (or March) of 1999 and that his understanding of the Bail Surety Agreement is limited because he cannot read English. The Trustee has failed to explain how this testimony is incriminating and I find no basis for so concluding.

■ As noted above, in order to have waived his right to assert his Fifth Amendment privilege, Debtor must have testified to incriminating facts. In *McCarthy v. Arndstein, supra,* 262 U.S. at 359, 43 S.Ct. 562, the Supreme Court found that in the involuntary examination of a debtor, he is practically in the position of witness under cross examination, and where the previous disclosure (in this case, the debtor's schedules) is not incriminating, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him. *See Natural Gas Pipeline Company v. Energy Gathering, Inc. (In re Natural Gas Pipeline Company),* 86 F.3d 464, 468–69 (5th Cir.1996) ("Because Fox did not admit at any earlier stage of this proceeding to guilt or to facts which are incriminating, he cannot be deprived of the right to assert the privilege [and he] was entitled to assert his fifth amendment privilege in refusing to release attorney billing records[.]"); *United States v. Allegheny Pepsi–Cola Bottling Company (In re Hitchings),* 850 F.2d 180 (4th Cir.1988) (since appellant who was called by the government as a witness at trial did not testify to an incriminating fact or an admission of guilt, she did not waive her right to assert her Fifth Amendment privilege against self-incrimination when called as a witness by the defense). Thus, I conclude that by testifying in the limited, non-criminating manner set forth above, Debtor did not waive his right to invoke his Fifth Amendment privilege in response to questions which asked him to divulge communications which he had regarding the Bail Surety Agreement and the Judgment.

■ During the § 341 examination, Debtor disclosed only one communication that he had with his son. According to Debtor's testimony, this conversation occurred when Debtor visited South Korea in April for the second time. Debtor asked his son to "come back" and his son told him he didn't "want to come back to America." Transcript, 8/9/99, at 9. The Trustee contends that, in view of this disclosure, the Debtor has waived his right to invoke the Fifth Amendment as to all communications which Debtor had with his son. Again, I disagree.

The communication which Debtor disclosed involved two facts, namely that Debtor asked his son to return to the United States and that his son refused. These facts are not incriminating *vis-a-vis* the Debtor. They reveal that Debtor wanted his son to return to the United States to face prosecution. In the absence of a criminating disclosure, no further testimony can be compelled given the Debtor's invocation of the Fifth Amendment privilege. *McCarthy v. Arndstein, supra.* Accordingly, Debtor's disclosure of his request to his son to return and his son's refusal do not present a basis for requiring further testimony by the Debtor.

■ However, even if these facts could be construed as incriminating,[16] Debtor's disclosure of the facts only precludes him from invoking his privilege against self-incrimination to avoid disclosing details of that conversation and only if the disclosure of those details do not present the danger of further incrimination. As noted above, in *Rogers v. United States, supra,* the Supreme Court held that "where incriminating facts have been voluntarily revealed, the privilege [against

---

16. Presumably the argument, which I reject, would be that by showing that Debtor had a conversation with his son in South Korea about returning to the United States, the testimony provides a link in the chain of evidence needed to prosecute the Debtor for aiding and abetting his flight from prosecution.

self-incrimination] cannot be invoked to avoid disclosure of details." 340 U.S. at 373, 71 S.Ct. 438. It further instructed that "[a]s to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination." *Id.* at 374, 71 S.Ct. 438. *See also In re Blan, supra,* 229 B.R. at 396 ("[I]t is well settled that a debtor may refuse to testify as to the details of previously disclosed facts if revealing those details would further incriminate him or subject him to new areas of incrimination.").

The requests in Interrogatory Nos. 12 and 13 that Debtor identify and describe all communications which Debtor had with his son regarding the Bail Surety Agreement and the Judgment do not request details of the aforementioned conversation. On the other hand, in Interrogatory No. 17, the Trustee asked Debtor to identify and describe all communications which he had with his son.

▇▇▇▇ The policy behind the rule relating to disclosure of details is self evident. As noted by the Supreme Court, [a] witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and the integrity of the factual inquiry. As noted in Rogers, a contrary rule 'would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony.' *Mitchell v. United States,* 526 U.S. 314, 119 S.Ct. 1307, 1311, 143 L.Ed.2d 424 (1999), *quoting Rogers,* supra, 340 U.S. at 371, 71 S.Ct. 438. In seeking information regarding all of the Debtor's communications with his son, the Trustee does not seek the details of the communication to which the Debtor testified. Moreover, this broad interrogatory, if required to be answered, would subject Debtor to a real danger of "further crimination" (assuming arguendo incriminating testimony had been given). In the face of further crimi-

nation, it is well established that the witness may stop answering questions. *See Conant v. McCaffrey,* 1998 WL 164946, at 6 (N.D.Cal. March 16, 1998) (holding that plaintiffs only waived their Fifth Amendment right against self-incrimination as to the precise statements which they made in sworn declarations about their communication with doctors and not as to other previously undisclosed communications since such further communications could further incriminate them). The fear of incrimination must be reasonable in light of the circumstances, the content of the questions and the setting in which the questions are asked. *United States v. Jones,* 703 F.2d 473, 475 (10th Cir.1983), *citing Zicarelli v. New Jersey,* 406 U.S. 472, 480, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). The claim of privilege cannot be sustained if the fear of self-incrimination is based on "remote and speculative possibilities." *Id.* The communication disclosed during the § 341 meeting reveals only that Debtor contacted his son after he had fled to South Korea and that he asked his son to return to the United States. Whereas this communication would provide an insufficient basis for charging Debtor with aiding and abetting flight to avoid prosecution, other communications between the Debtor and his son could lead to evidence that could be used to charge him. *See* page 225 *supra.* I thus conclude that Debtor has reasonable cause to fear danger from a response to this interrogatory and is therefore within his right to refuse to respond.

### III. SUMMARY

I conclude that Defendants validly invoked their right against self-incrimination as to the answers sought to be elicited by Interrogatories Nos. 12, 13 and 17 and that Debtor did not waive his right to assert the privilege in response to these interrogatories by testifying at the § 341 meeting. An Order consistent with this Opinion shall be entered.