**In re COTILLION INVESTMENTS, INC., Debtor.**

**No. 04–41606BKC–RAM.**

United States Bankruptcy Court, S.D. Florida.

May 25, 2006.

David L. Rosendorf, Esq., Kozyak, Tropin & Throckmorton, P.A., Coral Gables, Counsel for Petitioning Creditors.

Scott N. Brown, Esq., Tabas, Freedman, Soloff & Miller, P.A., Miami, FL, Counsel for Chapter 7 Trustee.

Joseph F. Frederick, III, Esq., Dooley Tarver & Frederick, P.A., Miami, FL, Personal counsel for Madow.

Robert C. Meyer, Esq., Robert C. Meyer P.A., Miami, FL, Counsel for the Debtor.

Steven D. Schneiderman, Miami, FL, Assistant United States Trustee.

### ORDER GRANTING MOTIONS TO COMPEL IN PART AND DENYING IN PART AND GRANTING SANCTIONS

ROBERT A. MARK, Chief Judge.

The issue raised by three pending motions to compel is the scope of the Fifth Amendment privilege available to the debtor's principal who has previously elected not to assert the privilege in sworn testimony given in this case. The issue is framed by the following motions: First United Bank's ("First United") Motion to Compel and for Sanctions (CP # 327); Trustee Joel Tabas' Motion (1) for Determination of the Applicability and Scope of Fifth Amendment Privilege, (2) to Compel Testimony and (3) for Sanctions Against Debtor's Principal (CP # 350) and Petitioning Creditors' Motion to Compel Testimony and for Sanctions (CP # 352) (collectively, the "Motions to Compel"). The Motions to Compel arise from the events surrounding a 2004 examination of Jason Madow ("Madow"), principal of the Debtor, conducted on November 22, 2005 ("the November deposition"). At the November deposition, Madow selectively invoked his Fifth Amendment privilege when examined by counsel for First United, the Trustee and the Petitioning Creditors.

#### Factual and Procedural Background

On December 14, 2004, an involuntary petition was filed against Cotillion Investments, Inc. ("Debtor" or "Cotillion") by the Petitioning Creditors. The Petitioning Creditors consist of several individuals who loaned approximately nine million dollars to the Debtor and failed to receive repayment on these loans. The Debtor contested the involuntary petition. Finding it necessary to prevent further loss to the estate, the Court, by Order dated February 15, 2005, granted the Petitioning Creditors' motion to appoint an interim

trustee (CP # 37), and Joel Tabas was appointed.

During the so-called "gap period," discovery was sought from the Debtor. It was during this initial discovery that Madow asserted his Fifth Amendment privilege. Specifically, when he appeared as Cotillion's representative at a Rule 30(b)(6) deposition conducted on February 8, 2005 ("the February deposition"), Madow asserted the privilege to nearly all questions posed to him by Petitioning Creditors' counsel. As discovery continued, Madow shifted his position and chose not to assert the privilege when he appeared for further depositions on June 30, July 1 and July 5, 2005 ("the June/July depositions"). At the June/July depositions, Madow stated on the record that he would not assert the privilege and he proceeded to answer questions posed to him by Petitioning Creditors' counsel covering a broad range of topics relevant to the Debtor's financial affairs. In addition, at subsequent Court hearings, Madow and his personal attorney, Barry G. Roderman ("Roderman"), informed the Court that Madow would no longer assert the privilege.

On September 23, 2005, an Order for Relief was granted on the involuntary petition (CP # 249). Cotillion filed its bankruptcy schedules on October 11, 2005 (CP # 270). Madow aided Cotillion's bankruptcy counsel in assembling the schedules and signed the schedules under oath as Cotillion's president.

Because the June/July depositions concentrated primarily on issues related to whether Cotillion was generally paying its debts as they came due, the Petitioning Creditors, Trustee and First United sought further discovery from Madow concerning the Debtor's assets and operations. Pursuant to a hearing held on November 8, 2005, this Court entered its Order Requiring Jason Madow to Appear for 2004 Examination (CP # 302) ("Order Requiring 2004 Examination"). The Order Requiring 2004 Examination stated in relevant part that Madow would sit for examination beginning on November 22, 2005 and that First United, the Trustee and the Petitioning Creditors would have an opportunity to examine Madow. On November 18, 2005, Debtor's counsel filed his Motion for Protective Order which raised a litany of issues that the Debtor and Madow had concerning the Order Requiring 2004 Examination. One of these issues concerned Madow's reluctance to sit for examination on November 22, 2005, because Roderman would be unable to attend. The Motion for Protective Order did not state that Madow was intending to assert the privilege. The Court rejected this request for extension, entering its Order denying Motion for Protective Order (CP # 321) on November 21, 2005. The court faxed each party a copy of this Order at or around 2:30 p.m. on November 21, 2005. The next day, when Madow appeared for the November deposition, he again changed his position and reasserted the privilege.

Due to the seriousness and complexity of issues concerning privilege, along with the fact that the Trustee has been hampered in administering this estate, resulting in large part from Madow's refusal to cooperate, the Court, after reviewing the Motions to Compel, entered its Order Resetting Hearing and Setting Briefing Schedule (CP # 376). The purpose of this Order was to allow the movants an opportunity to set forth the particular subject areas in which they asserted Madow had waived privilege and to allow Madow's new personal counsel an opportunity to present argument on why no such waiver resulted. In response, First United filed its Supplemental Memorandum of Law on Motion to Compel (# 383) and the Trustee and the Petitioning Creditors jointly filed their

Joint Supplement to Motions to Compel Testimony (CP # 387). Madow in turn, filed his Memorandum of Law in Support of Fifth Amendment Privilege (CP # 396). The Trustee and the Petitioning Creditors then filed their Reply in Support of Motions to Compel Testimony (CP # 393). Following submission of the memoranda, the Court conducted a hearing on the Motions to Compel on February 1, 2006.

Following this hearing, the issue of Madow's potential criminal exposure took on a new twist when the Court was alerted to a criminal indictment brought by the United States Attorney's Office against Madow in the Middle District of Florida, Orlando division. As part of a plea agreement, Madow pled guilty to one count of conspiracy to commit wire fraud. The facts in the plea agreement center on Madow's active participation in a conspiracy to defraud various lending institutions. Madow, partly in his capacity as president of the Debtor, submitted false documentation and information concerning various real estate investments to these lending institutions. Acting on this false information, the lending institutions loaned excessive funds to his co-conspirator, Terry Mughar. Mughar in turn, kicked back some of these proceeds to Madow. Once alerted to this criminal indictment and subsequent plea agreement, the Court entered its Order Requesting Further Briefing (CP # 419). The Order requested the parties to brief whether the plea agreement affected the Fifth Amendment issues raised before this Court. Petitioning Creditors and the Trustee along with Madow filed their respective Responses (CP # 429, 436).

Neither the Petitioning Creditors nor the Trustee believe the Orlando indictment and subsequent plea agreement affect this Court's analysis of the privilege issues raised in the Motions to Compel. By contrast, Madow asserts a direct impact, claiming that the testimony he gives in this case could be used to violate the terms of the plea agreement "and subject Madow to an increased sentence, prosecution for perjury or the resurrection of charges dismissed by entry of the plea." Madow Response, p. 2.

The Court finds that the Orlando indictment and plea agreement do not affect the issues pending before this Court. The plea agreement certainly does not preclude Madow from testifying in this case. The alleged risk that his testimony here could conflict with testimony or statements he provides in Orlando is a risk over which Madow has full control. There is no risk of perjury if Madow simply tells the truth to the United States Attorneys Office and tells the truth in further depositions in this case.

With the above hurdle removed, as previously stated, the issue this Court addresses is the scope of the privilege available to Madow following his prior sworn testimony given in this case. After a review of the legal memoranda and consideration of the arguments of counsel and the relevant case law, the Court will grant the Motions to Compel in part and deny them in part.

### Discussion

### I. General Fifth Amendment Principles

The Fifth Amendment privilege allows for an individual to refuse to testify on the basis that such testimony will incriminate him. It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used. *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). "The privilege afforded not

only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

 The Fifth Amendment privilege has limitations. A corporation has no privilege. *Braswell v. United States,* 487 U.S. 99, 103, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). As a result, a custodian of corporate records may not refuse to produce corporate documents on the basis of an individual corporate representative's personal privilege, even if the documents may tend to incriminate the custodian individually. *Id.* at 113, 108 S.Ct. 2284. The privilege may also be waived. The privilege is waived if not invoked. *Rogers v. United States,* 340 U.S. 367, 371, 71 S.Ct. 438, 95 L.Ed. 344 (1951). The privilege may also be waived when an individual offers testimony in his own behalf. *Brown v. United States,* 356 U.S. 148, 155–57, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958).

## II. Madow has waived any protection as to several areas of inquiry because he voluntarily revoked his right to assert the privilege

Madow offers three arguments against waiver: (1) No waiver occurred at the November deposition because any privilege that was waived in the June/July depositions was at a separate proceeding or stage; (2) any waiver by Madow at the November deposition was not knowing and intelligent; and (3) Madow has not waived privilege because any statements he made at the June/July depositions and the November deposition did not inculpate him; however, if Madow answers further questions, those answers could include incriminating statements.

## A. The Court rejects Madow's arguments that the November deposition was during a separate proceeding or stage

 Madow argues that a waiver of one's right against self-incrimination in one proceeding or stage of a proceeding is not a waiver of the privilege in a separate proceeding or stage. *See In re Neff,* 206 F.2d 149, 152 (3d Cir.1953). Based on the above premise, Madow asserts that the June/July depositions occurred during either a "separate proceeding" or a different "stage" because the contested involuntary petition had not been adjudicated and no order of relief had been entered. Thus, Madow argues that any waiver which occurred during the involuntary proceeding's depositions in June and July would not apply to the November deposition, which was conducted after the Debtor stipulated to relief on the involuntary petition and the case was proceeding as a chapter 7 case.

 Madow is correct in his statement of the law but not in its application to the facts here. "It is settled by the overwhelming weight of authority that a person who has waived his privilege of silence in one trial or proceeding is not estopped to assert it as to the same matter in a subsequent trial or proceeding." *In re Nam,* 245 B.R. 216, 228 (Bankr.E.D.Pa. 2000); *see also United States v. Gary,* 74 F.3d 304, 312 (1st Cir.1996) (stating it is "hornbook law" that a witness' waiver of his right against self-incrimination is limited to the particular proceeding in which the witness appears). The question is: Did entry of an order for relief on the involuntary petition make this a "separate proceeding" or "stage"? Clearly, the answer is no.

In *In re Mudd,* 95 B.R. 426 (Bankr. N.D.Tex.1989), the court held that a debtor had waived his privilege against self-

incrimination in an adversary proceeding brought against him because of statements he made at several section 341 meetings of creditors and Rule 2004 examinations. In regard to the issue of separate judicial proceedings, the court found that the debtor's statements at these prior proceedings occurred during the same "judicial proceeding" as the dischargeability action because the "subject matter of the [dischargeability action was] so interwoven" with the main bankruptcy case. *Id.* at 431.

Likewise, the Court finds that in this case the subject matter of the June/July depositions, which occurred in the so-called gap period, is "interwoven" with the matters raised at the November deposition involving the administration of the estate. During both periods, the intention has been to decipher the business operations of the Debtor, and more importantly, to find out what happened to assets acquired with several million dollars of creditor funds. To that extent, at both the June/July depositions and the November deposition, questions have been posed to Madow regarding Cotillion's assets and operations, document retention and Madow's involvement with the Debtor. *Cf. Nam*, 245 B.R. at 233 (proper analysis as to separate proceeding issue should focus on the relatedness of the matters raised at the section 341 meeting in the main case and in the later brought adversary proceeding). Madow's argument focuses solely on cosmetic differences between the gap period and the administration period, such as the nomenclature of the parties, matters of procedure and administration of the estate. Under the reasoning and analysis set forth in *Mudd* and *Nam*, the Court finds these distinctions irrelevant.

**B. Madow's waiver at the November deposition was knowing and intelligent**

■ At the November deposition Madow did answer some questions which

movants now argue waived privilege as to any follow-up questions regarding the same subject areas. Aside from asserting that no waiver occurred, Madow also claims that any waiver of the privilege at the November deposition was not knowing and intelligent because Roderman, his personal attorney, did not attend the November deposition and the moving parties failed to "educate" Madow about his Fifth Amendment rights at this deposition. This argument is rejected. Just because his attorney did not appear at the November deposition, Madow cannot shout "do over" for the statements he voluntarily made. Madow does not cite nor is this Court aware of any case that holds that no waiver results in a civil matter when the witness' lawyer was not present. Rather, the opposite appears to be true. *See United States v. White*, 846 F.2d 678, 691 & n. 19 (11th Cir.1988) (overruling lower court's finding that witness had not waived privilege partly because witness did not have attorney present at deposition).

To begin with, Madow's argument is somewhat specious since Roderman was not present at the June/July depositions either. Moreover, this Court will not rehash the many instances in which the issue of Madow asserting or not asserting the privilege was raised. Simply, since the first time Madow asserted the privilege at the February deposition and then later announced he would not assert the privilege at the June/July depositions, there is no doubt that Madow has been aware of his right to assert the privilege and the consequences of electing to testify. To now state that at the November deposition, he was suddenly and conveniently unaware of his right to assert the privilege is to engage in some perverse form of revisionist history. Madow is not nearly as naive or incompetent as he selectively wants this Court and the other parties to believe.

Moreover, Madow and Roderman had sufficient time to confer and consider whether Madow should assert the privilege at the November deposition. Based on the hearing conducted on November 8, 2005, and this Court's Order Requiring 2004 Examination, it is undeniable that Madow and Roderman were fully aware that the examination was going forward on November 22, 2005. This awareness was further reinforced when the Court rejected the Debtor's Motion for Protective Order on November 21, 2005. Thus, Madow had at least a two-week period starting from the time of the November 8th hearing to confer with Roderman and discuss any concerns he had regarding the assertion of privilege. Accordingly, the Court rejects Madow's assertion that any waiver of privilege was not knowing and intelligent because Roderman was not present. Finally, as for the failure of opposing counsel to educate Madow on his right to assert privilege, Madow cannot cite to any case which holds that a party in a civil action is required to educate its opponent on the assertion of privilege or the consequences of failing to assert it. The only cases that so hold involve custodial interrogations and therefore, are not applicable here. *See Garner v. United States,* 424 U.S. 648, 654 n. 9, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976) (stating that in non-custodial interrogation, "an individual may lose the benefit of the privilege without making a knowing and intelligent waiver").

Madow also alleges that any advice by Roderman relating to the November deposition was tainted because Roderman was

contemplating a lawsuit against Madow on the date of the November deposition. A review of the facts defeats this argument. On November 29, 2005, the Trustee sent a demand letter to Roderman requesting return of the funds that Madow paid to Roderman.[1] The Trustee then filed an adversary proceeding against Roderman to recover such funds on December 14, 2005.[2] Roderman in turn, filed his third party complaint against Madow on December 30, 2005.

Based on this timeline, it is apparent that at the time the November deposition was conducted, no conflict existed between Roderman and Madow. From the time that the demand letter was sent to Roderman, at least one week passed from the November deposition before Roderman would have even contemplated bringing suit against Madow. As such, Madow's assertion that Roderman's advice was potentially tainted is unavailing in light of the actual facts. Finally, the Court finds Madow's attack on Roderman to be disingenuous since a reading of the plea agreement between Madow and the United States Attorneys Office, which was entered into on January 31, 2006, reflects that Madow was once again represented by Roderman.

## C. Madow has waived the privilege as to all topics at the June/July deposition and to matters related to the Debtor's bankruptcy schedules

### 1. Waiver at the June/July depositions

█ The Court now addresses Madow's primary argument, that the privilege

---

1. Madow allegedly paid Roderman $80,000 in retainers to represent him.

2. The adversary proceeding, styled as *Joel Tabas v. Barry G. Roderman and Associates, P.A.,* 05–6133–RAM–A, sought recovery of an $80,000 retainer paid to Roderman. The complaint alleged, among other things, that

the payment by Cotillion to hire criminal counsel for Madow individually was an unauthorized postpetition transfer. Roderman ultimately agreed to a settlement in which he is paying $70,000 to the Trustee and receiving an allowed $30,000 unsecured claim against the estate.

has not been waived and in particular, his argument that providing non-incriminating testimony on various topics did not waive his right to assert the privilege if further testimony in these areas might be incriminating. The Court starts with the basic premise: The privilege is waived if it is not invoked. *Rogers,* 340 U.S. at 371, 71 S.Ct. 438. It is without dispute that at the beginning of the June/July depositions, Madow unequivocally stated he would not assert the privilege:

Q: Okay, and let me just make clear for the record what has been announced in Court, but I want to make sure that we have it here as well. You have previously appeared for deposition as the corporate representative of Cotillion Investments, correct?

A. Correct.

Q. And at the prior deposition, you, on the advice of your counsel, Mr. Roderman, invoked the 5th Amendment privilege against self-incrimination in response to several of the questions that I asked at that deposition, correct?

A. Correct.

Q. Okay. You are represented by counsel at this deposition as well?

A. Correct.

Q. And I have been advised that you will not, for purposes of this deposition be invoking your 5th Amendment privilege against self-incrimination in response to questions, is that correct?

A. I object to one part, it's overly broad, but I do not anticipate——

Q. Okay.

A. ——invoking the 5th Amendment.

Q. And you have conferred with counsel regarding your decision to appear and testify here today?

A. Correct.

Q. And you are doing so freely and without coercion, and after having obtained the advice of your counsel, correct?

A. Correct.

Deposition of Jason Madow, June 30, 2005, p. 74–76. Based on this express, voluntary renunciation by Madow, the Court finds that Madow waived the privilege by not invoking it as to those issues raised at the June/July deposition. With this in mind, after a review of the June/July deposition transcripts and the scope of the topics raised, Madow has waived privilege to the following areas of inquiry:

a. Madow's association with the Debtor;

b. Madow prior employment and occupation;

c. The extent of the Debtor's business activities;

d. The Debtor's documents and business records, including but not limited to, its document retention policies and manner of storing documents;

e. The Debtor's bank records and bank accounts;

f. The Debtor's bookkeepers and accountants and the scope of their duties;

g. All information regarding mortgages located in the DIP report of December 31, 2004;

h. Properties owned by the Debtor;

i. Transactions with Madow family members, including Bonnie Madow;

j. Assignment of Debtor's mortgages to satisfy obligations owed to members of the Petitioning Creditors;

k. Transfers of Petitioning Creditors funds directed to title agencies and Joseph Ganguzza's account;

354

l. Use of Simon Posen's funds by the Debtor;

m. Purpose of Cotillion Investment I, Inc., its relationship with the Debtor and its business transactions;

n. Latour Mortgage Corporation and its relationship with the Debtor and Glen Cove project;

o. Purchase, financing and management of the Glen Cove property, including payment history of loans made to finance the acquisition of Glen Cove and payment history of tenants occupying units owned by the Debtor;

p. First Capital mortgage and its relationship with the Debtor;

q. Operation and management of Timbuktu Properties and its relationship with the Debtor;

r. Debtor's relationship with Anne Steffenson;

s First Capital American Express card and debts incurred on the card;

t. Antonio Duque/ Elite Bulldozing/ Endeavor Properties and its relationship with the Debtor;

u. Debtor's relationship with Marian Szabo;

v. Debtor's relationship with Terry Mughar;

w. Loans made to the Debtor, payment history and terms of such loans; and

x. Debtor's purchase and sale of tax certificates.

■ Madow argues that his prior testimony as to the above subjects did not inculpate him and therefore, he did not waive the privilege as to follow up questions which, if answered, could incriminate him. The Court rejects this argument. Once Madow testified on these subjects, he waived the right to assert the privilege as to the details. *See, e.g., Mitchell v. United States*, 526 U.S. 314, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999); *United States. v. Gwinn*, 2003 WL 23357667 (M.D.Fla. Aug.15, 2003).

■ Madow's characterization of his prior testimony is improperly narrow and indeed, contrary to the arguments his counsel presented at the February 1st hearing. As his counsel correctly noted at the hearing, albeit in response to an argument that Madow had improperly invoked the privilege at the November deposition in response to seemingly innocuous questions, the privilege may be invoked if testimony, which itself is not incriminating, could provide a link in the chain of evidence to prosecute Madow. *See Hoffman,* 341 U.S. at 486, 71 S.Ct. 814. Applying that standard here, if Madow was concerned about potential criminal liability arising out of the disposition of Cotillion's assets, he should have asserted the privilege at the June/July depositions when asked about these assets. Instead, he chose to testify. Some clear examples (of the many reflected in the transcripts) appear in the following excerpts regarding Cotillion's disposition of assets, including mortgages and real property:

Q: Excluding [the Latour mortgage], the DIP report represents that Cotillion held ten mortgages as of when that document was prepared, which was the end of December 2004, correct?

A: Correct.

Q: What happened to all of the rest of the mortgages?

A: They were either refinanced or sold.

Deposition of Jason Madow, July 5, 2005, p. 472. Madow's testimony went even further in discussing condominium properties owned by Cotillion:

Q: What happened to the rest of the properties that are identified in the

documents that you produced, but are not listed in the DIP report?

A: Some of them were sold because the condo laws in the individual associations changed, which prohibited rentals.

. . . .

Q: Okay. What about other properties?

A: They were sold.

. . . .

Q: Where were the proceeds of sales of these condo units deposited?

A: They were always sent to Cotillion.

Deposition of Jason Madow, July 5, 2005, p. 479–80, 482–83.

These quoted exchanges highlight a simple point. If Madow had a fear of prosecution based on conduct relating to the disposition of any of the mortgages or properties discussed at the June/July depositions, he should have asserted the privilege in response to questions about these topics. The above testimony could certainly be a link in the chain of evidence if, for example, Madow personally misappropriated funds. Madow could not voluntarily testify that Cotillion sold assets and received the money and then refuse to answer follow-up questions about the Debtor's disposition or use of those funds. Thus, in sum, by voluntarily answering questions involving the above listed topics at the June/July depositions, Madow waived the privilege as to all follow-up questions regarding these topics.

## 2. Waiver at the November deposition

 Unlike the June/July depositions, Madow did not voluntarily state on the record at the November deposition that he would waive his right to assert privilege. Instead, Madow began to answer questions on several topics not addressed at the June/July depositions. These topics all revolved around the completion of the Debtor's bankruptcy schedules and certain statements contained therein. Specifically, the areas of inquiry related to a potential fraudulent transfer made to Madow, particular auto leases and the various values attributed to assets listed on the Debtor's bankruptcy schedules. At a certain point during the examination, Madow asserted the privilege. Based on the initial answers Madow gave to questions on these topics, movants argue that Madow could not close the door on further inquiry. Conversely, Madow again asserts that the statements, by themselves, did not inculpate him but answering further questions on these topics could lead to incriminating statements. The issue then, is whether Madow's initial conduct waived his right to now assert the privilege as to inquiries regarding Cotillion's schedules.[3]

In *Brown*, the Supreme Court held that when a witness voluntarily takes the stand and offers testimony on his own behalf, even if his testimony is not incriminating, he waives the right to assert the privilege against self-incrimination in response to cross-examination on matters raised by his testimony. *Nam*, 245 B.R. at 227 n. 8 (Bankr.E.D.Pa.2000) (citing *Brown*, 356 U.S. at 148, 78 S.Ct. 622). Explaining the rationale for this rule, the Supreme Court stated:

[W]hen a witness voluntarily testifies, the privilege against self-incrimination is

---

**3.** The movants argue that in regard to the topics raised at the November deposition, Madow implicitly waived the privilege, specifically, by testimonial waiver. The movants ask this Court to apply the test set forth in *Klein v. Harris*, 667 F.2d 274, 287–88 (2d Cir.1981) and find a testimonial waiver. Although *Klein* is good law, the Court finds *Brown* to be more applicable in these particular circumstances and therefore, declines to apply the *Klein* test.

amply respected without need of accepting testimony freed from the antiseptic test of the adversary process. The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the privilege gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell.... The interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.

*Brown,* 356 U.S. at 155–56, 78 S.Ct. 622 (internal citation omitted) (footnote omitted).

The Court finds the holding and reasoning in *Brown* applicable here to questions arising from the Debtor's schedules. The end of the Debtor's schedules, in conspicuous typeface, includes the following statement:

DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF CORPORATION OR PARTNERSHIP: I, the President of the Corporation named as debtor in this case, declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of 20 sheets, and that they are true and correct to the best of my knowledge, information, and belief.

Following this statement, is Madow's signature, dated October 11, 2005. The Court concludes that by making this sworn statement, Madow has waived the privilege in regard to the information contained within the Debtor's schedules. The opposite conclusion would allow Madow to swear to the veracity of the Debtor's assets and liabilities without answering inquiries to the very information he provided and thus, grant him "an immunity from cross-examination on the matters he has himself put in dispute." *Id.* at 155, 78 S.Ct. 622. Madow, through the above sworn statement, has painted a picture of the Debtor's assets and liabilities and the corresponding values associated with these items.[4] The movants must then be allowed to question his portrayal by, for example asking Madow what information he relied upon to calculate the values set forth in the Debtor's schedules and to confirm that the asset or liability listed was in fact, still owned or owed by the Debtor as of the date of the involuntary petition.[5]

---

4. A review of the November deposition reveals that the effective date of the Debtor's schedules was the date that the involuntary petition was filed.

5. The Court is not finding that by signing the bankruptcy schedules, Madow has waived the privilege as to all questions regarding the Debtor's assets and liabilities. By way of example, if the schedules do not list an asset which was at one time owned by the Debtor according to its records and the asset does not fall within one of the areas of inquiry listed earlier in which the privilege was waived, Madow may invoke the privilege if asked about the disposition of the asset or the proceeds realized from the disposition of the asset. In addition, Madow may assert the privilege regarding postpetition disposition of assets listed on the schedules if the asset does not fall within one of the areas of inquiry listed earlier in which the privilege was waived.

## D. Madow must testify about documents

Finally, the Court finds it necessary to specifically address the issue of document production. The battle over documents has dogged this case from its inception, and in the process, taken up an inordinate amount of this Court's time. Although numerous hearings have been held and several orders entered compelling production of documents, basic questions still remain unanswered. The issue here is twofold: (1) Whether Madow can refuse to produce documents, and (2) whether Madow can refuse to answer questions concerning document production.

 First, Madow cannot refuse to turnover the Debtor's documents on the basis that such documents may incriminate him. It is hornbook law that a corporation has no Fifth Amendment privilege. Therefore, a corporate custodian, Madow in this case, must turn over all documents requested. *Braswell*, 487 U.S. at 113, 108 S.Ct. 2284. Second, as to whether Madow can refuse to answer questions concerning document production, Madow has waived any privilege regarding the existence and location of documents pursuant to the reasoning espoused in *Brown*, 356 U.S. at 148, 78 S.Ct. 622.

By stating on the record at both the June/July deposition, as well as the November deposition, that he (Madow) "turned over all documents in my possession," Madow has opened the proverbial door. He "cannot reasonably claim that the privilege gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute." *Id.* at 155–56, 78 S.Ct. 622. The movants shall be allowed to test the veracity of his conclusory statement by, for example, asking Madow where the Debtor's documents were located or are currently located, what has hap-

pened, if anything, to documents previously stored at these locations and whether Cotillion or Madow has or had electronic records/computers containing information about Cotillion's assets, liabilities and operations. To allow Madow to make such a blanket, self-serving statement without allowing the movants to test the veracity of this statement, gives Madow a "positive invitation to mutilate the truth." *Id.* at 156, 78 S.Ct. 622.

## E. Madow has not waived his assertion of the privilege as to First United on some topics

First United stands in a different posture than the Trustee and Petitioning Creditors. First United's involvement in this case centers around certain mortgages issued by the Debtor to third parties. These mortgages were collaterally assigned to First United ("First United Mortgages"). Madow, when asked about the status of these mortgages at a hearing, informed the Court that some of them had been satisfied. These unsworn statements came as a surprise to First United, considering that it has not yet been paid on its loan which was secured by these mortgages. At the November deposition, First United had its first opportunity to get formal discovery from Madow concerning the satisfaction of the mortgages. When asked about the First United Mortgages, Madow asserted the privilege. Madow also asserted the privilege in response to certain general questions asked by First United unrelated to the specific mortgages.

 First United's argument is that Madow's assertion of the privilege is improper, not necessarily because of waiver, but rather, because Madow does not face any criminal liability from answering the general questions posed to him. First United lists several topics in which it

claims Madow's refusal to answer lacks any foundation for criminal exposure. The Court agrees with First United that several questions do no appear to raise any criminal exposure nor "furnish a link in the chain of evidence needed to prosecute the claimant." *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814. Therefore, unless Madow can show why "a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result," *id.* at 487, 71 S.Ct. 814, the Court finds that inquiry into the following areas is not protected by the privilege:

a. Dates which Madow met with counsel to discuss privilege;

b. Whether Madow is presently employed;

c. Whether the Debtor ever had any other licensed mortgage broker in its employ besides Madow; and

d. Whether the Debtor had any lawyer on retainer prepetition.

However, this Court disagrees with First United that other issues listed in its Motion will not possibly result in criminal exposure for Madow. The issues listed pertain in some manner to the First United Mortgages. Specifically, they are as follows:

a. Madow's signature on certain documents related to First United;

b. Whether Madow ever maintained records relative to the First United Mortgages;

c. When the last time was that the Debtor received payment on the First United Mortgages;

d. Efforts Madow made to locate records relevant to the First United Mortgages; and

e. Whether any lawyers advised Madow in any way with respect to the First United Mortgages.

Here, Madow's assertion of the privilege is proper, primarily because the answers to these questions could incriminate him or "furnish a link in the chain of evidence needed to prosecute the claimant." *Id.* at 486, 71 S.Ct. 814. This however, does not end the inquiry.

Although the assertion of the privilege may well have been justified, Madow has waived his rights in regard to several of the above topics. In particular, Madow has waived the privilege as to issues "b", "c" and "d". In regard to issues "b" and "d", as explained above, by stating on the record that he turned over all documents in his possession when queried about the First United Mortgages, First United is permitted to find out exactly what documentation Madow had in his possession regarding these mortgages and where it was located. As for issue "c", to the extent that the First United Mortgages are listed in the Debtor's schedules,[6] Madow is obligated to answer questions regarding the information he employed to calculate the values set forth in the Debtor's schedules and the status of these mortgages as of the involuntary petition date. Finally, it is unclear from the record whether the ten mortgages listed in the DIP report as of December 31, 2004 are part of the First United Mortgages. Thus, unless any of these mortgages are listed in this report, with regard to all other remaining issues concerning the First United Mortgages, Madow may assert the privilege.

### III. Sanctions are appropriate against Madow

In connection with the Motions to Compel, the movants have requested sanctions against Madow in his individual ca-

---

**6.** Conditioned on the limitation set forth in footnote 5, *supra*.

pacity. The movants argue that based on a review of the record, including the events that transpired immediately before the November deposition, an award of sanctions is appropriate. As to First United, the Court finds Madow's conduct leading up to the November deposition sufficient, in of itself, to warrant an award of sanctions. Based on the June/July depositions, Madow gave the Court and the movants the clear impression that he would testify and not assert the privilege. In subsequent hearings, Madow, although not sworn in, voluntarily answered questions posed by the Court in regard to the First United Mortgages. Moreover, Madow has engaged in discussions with First United's counsel regarding the First United Mortgages as detailed in the e-mails attached to First United's Motion to Compel. Specifically, in a September 8, 2005, e-mail to counsel for First United, Madow provided summary information regarding four of the five loans which secured First United's loan to Cotillion and stated, "I wish to cooperate in every which way." First United's Motion to Compel, Exhibit "B". In addition, in a September 30, 2005 e-mail to First United's counsel, Madow stated "I want to make it clear that I will be available at all times for you in the future." First United's Motion to Compel, Exhibit "C". Finally, Madow gave no indication that he would assert the privilege when the scheduling of the November deposition was discussed at the November 8th hearing. Rather, it was not until the November deposition that the issue of privilege was once again sprung upon the parties and this Court.

Under these circumstances, the Court finds it appropriate to sanction Madow, at a minimum, for a portion of the fees incurred by counsel for First United in attending the November deposition. Although an award of fees might not fit perfectly into Rule 37(a)(4), under 11 U.S.C. § 105 of the Bankruptcy Code and this Court's inherent power to control the proceedings, sanctions are appropriate. Simply stated, you cannot jerk people around as Madow has done and not suffer some consequence.

■ As to the Trustee and Petitioning Creditors, the request for sanctions will be denied without prejudice. Madow did provide some testimony in response to their questions at the November deposition and the privilege issues addressed in this Order are not frivolous. However, denial of sanctions comes with a warning. Unless this Order is stayed or modified by the District Court, Madow must now provide testimony. If Madow refuses to appear for deposition and provide the testimony as compelled by this Order, the Court will find him in contempt and consider all appropriate remedies to coerce compliance, including incarceration. Moreover, appearing for deposition but providing evasive or incomplete answers will not be tolerated. Thus, to the extent that Madow, who was the sole owner, officer and director of the Debtor, suddenly has memory lapses concerning topics which the Court has found he has waived his Fifth Amendment privilege to, this evasive or incomplete testimony will also result in a finding of contempt. Simply, this Court's leniency is at an end. Madow can now choose to cooperate or suffer further consequences.

### Conclusion

■ Waiver of the Fifth Amendment privilege is something that "is not to be lightly inferred." *Klein,* 667 F.2d at 287. Conversely, this Court will not tolerate invocation of privilege when there is no sound basis in law or fact, and instead, is invoked solely for the purpose of obstructionism. Therefore, it is—

**360**

**ORDERED** as follows:

1. Trustee Joel Tabas' Motion (1) for Determination of the Applicability and Scope of Fifth Amendment Privilege, (2) to Compel Testimony and (3) for Sanctions Against Debtor's Principal and Petitioning Creditors' Motion to Compel Testimony and for Sanctions are granted. Madow has waived the right to assert his Fifth Amendment privilege to questions relating to the following topics:

a. Madow's association with the Debtor;

b. Madow prior employment and occupation;

c. The extent of the Debtor's business activities;

d. The Debtor's documents and business records, including but not limited to, its document retention policies and manner of storing documents;

e. The Debtor's bank records and bank accounts;

f. The Debtor's bookkeepers and accountants and scope of their duties;

g. All information regarding mortgages located in the DIP report of December 31, 2004;

h. Properties owned by the Debtor;

i. Transactions with Madow family members including Bonnie Madow;

j. Assignment of Debtor's mortgages to satisfy obligations owed to members of the Petitioning Creditors;

k. Transfers of Petitioning Creditors funds directed to title agencies and Joseph Ganguzza's account;

l. Use of Simon Posen's funds by the Debtor;

m. Purpose of Cotillion Investment I, Inc., its relationship with the Debtor and its business transactions;

n. Latour Mortgage Corporation and its relationship with the Debtor and Glen Cove project;

o. Purchase, financing and management of the Glen Cove property, including payment history of loans made to finance the acquisition of Glen Cove and payment history of tenants occupying units owned by the Debtor;

p. First Capital mortgage and its relationship with the Debtor;

q. Operation and management of Timbuktu Properties and its relationship with the Debtor;

r. Debtor's relationship with Anne Steffenson;

s. First Capital American Express card and debts incurred on the card;

t. Antonio Duque/ Elite Bulldozing/ Endeavor Properties and its relationship with the Debtor;

u. Debtor's relationship with Marian Szabo;

v. Debtor's relationship with Terry Mughar;

w. Loans made to the Debtor, payment history and terms of such loans;

x. Debtor's purchase and sale of tax certificates; and

y. Information relied upon to calculate the values set forth in the Debtor's schedules and whether asset or liability listed in the schedules was still owned or owed by the Debtor as of the date of the involuntary petition.

2. First United's Motion to Compel is granted in part. Madow has waived the privilege to the following topics:

a. Dates which Madow met with counsel to discuss privilege;

b. Whether Madow is presently employed;

c. Whether the Debtor ever had any other licensed mortgage broker in its employ besides Madow;

d. Whether the Debtor had any lawyer on retainer prepetition;

e. Whether Madow ever maintained records relative to the First United Mortgages;

f. To the extent that the First United Mortgages are located within the Debtor's schedules, how Madow calculated the value of these mortgages and their disposition as of the involuntary petition date; and

g. Efforts Madow made to locate records relevant to the First United Mortgages.

3. First United's Motion to Compel is denied in part. Madow has not waived the privilege to the following topics:

a. Madow's signature on certain documents related to First United;

b. Whether any lawyers advised Madow in any way with respect to the First United Mortgages; and

c. To the extent that the First United Mortgages are not located in the DIP report of December 31, 2004, all other inquiries concerning the First United Mortgages.

4. First United's request for sanctions is granted. Madow shall pay First United $1,000 as a sanction. This amount represents the unnecessary fees incurred by First United due to Madow's failure to disclose his intention that he would refuse to provide testimony at the November deposition regarding the First United Mortgages.

5. This Court will not consider a request to stay this Order if Madow files an appeal to the District Court. Therefore, pursuant to Fed.R.Bankr.P. 8005, Madow must seek a stay in the District Court if he files an appeal.

6. Absent entry of a stay pending appeal by the District Court, Madow shall appear for further examination within thirty (30) days after entry of this Order at a time and date mutually convenient to counsel for the movants.